JOHN W. EVANS ET AL. *v.* GENERAL
MOTORS CORPORATION
(SC 17420)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued October 25, 2005—officially released March 28, 2006

*Frank P. Porcelli*, with whom were *Robert J. Silverman, Steven D. Ecker* and, on the brief, *Susan Dixon*, for the appellants (plaintiffs).

*Jonathan F. Putnam*, pro hac vice, with whom were *Jeffrey R. Babbin, Lee Ann Stevenson*, pro hac vice, and, on the brief, *John T. Hickey, Jr.*, pro hac vice, *Jonathan M. Freiman*, and *Zachary S. Brez*, pro hac vice, for the appellee (defendant).

*William F. Gallagher* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

ZARELLA, J. In this action seeking damages for the alleged misappropriation of a trade secret, the plaintiffs,

John W. Evans and Evans Cooling Systems, Inc. (ECS),[1] appeal from the judgment of the trial court rendered in favor of the defendant, General Motors Corporation (General Motors). The plaintiffs claim that the trial court improperly: (1) deprived them of the right to a jury trial on their trade secret claims; (2) failed to impose appropriate sanctions on General Motors after finding that key employees of the company had fabricated evidence and testified falsely about that evidence in their depositions; (3) determined that General Motors' special defenses of license and release barred the plaintiffs' trade secret claims; and (4) precluded the plaintiffs from introducing evidence that the technology used in General Motors' "Gen III" engines was "substantially derived" from the allegedly stolen secret. Because we conclude that the trial court improperly deprived the plaintiffs of the right to a jury trial on their trade secret claims but imposed appropriate sanctions on General Motors for its employees' discovery abuse, we reverse in part the judgment of the trial court and remand the case for a new trial.

The following facts are relevant to our resolution of this appeal. Evans is an inventor of various automotive cooling system techniques and improvements in the field of internal combustion engines. Prior to 1984, he began work on technology to implement an aqueous reverse flow cooling system, which he regarded as a

---

[1] ECS, the assignee of the interest in the trade secret at issue, was joined as a plaintiff pursuant to an order of the United States District Court for the District of Connecticut, which also remanded the case to the Connecticut Superior Court following the resolution of certain patent infringement litigation. See *Evans* v. *General Motors Corp.*, 939 F. Sup. 158, 159 (D. Conn. 1996). In that litigation, the District Court determined that a patent obtained by Evans for the allegedly misappropriated technology was invalid because the vehicle in which the technology was employed, namely, the 1992 Corvette, had been on the market for more than one year prior to the filing of the patent application. See *Evans Cooling Systems, Inc.* v. *General Motors Corp.*, 939 F. Sup. 154, 155 (D. Conn. 1996), aff'd, 125 F.3d 1448 (Fed. Cir. 1997), cert. denied, 522 U.S. 1115, 118 S. Ct. 1050, 140 L. Ed. 2d 113 (1998).

trade secret. Thereafter, beginning in April, 1984, and continuing through February, 1989, Evans was employed by General Motors as a consultant and performed various engineering projects for the company. During that time, none of his work for General Motors involved the technology that he had developed for the aqueous reverse flow cooling system. In February, 1989, however, Evans received a telephone call from Al Gunther, a General Motors engineer, who requested that Evans demonstrate the system to the company. Evans informed Gunther that he would be willing to do so, but, because he considered the technology used in the system to be proprietary in nature, it would have to be a "black box" demonstration "whereby the [technology] would not be disclosed or submitted to [General Motors] and [General Motors] would not compromise the secrecy of [the system]." According to Evans, Gunther agreed to these conditions.

On February 27, 1989, Evans prepared and delivered to Gunther a memorandum setting forth the conditions to which they had agreed. The only consideration that Evans would receive for the "black box" demonstration was access to the written results of the testing and an agreement of nonappropriation between the parties.

On March 16 and 17, 1989, Evans demonstrated the system to General Motors engineers and other employee technicians at a General Motors testing facility in Michigan. Evans claims that, at some time during the two days that he was in Michigan, General Motors violated the terms of the "black box" agreement by examining the test car that was equipped with the protected technology.

Evans later testified at trial that he did not discover the theft until the fall of 1991, when he came across a cover story in an automotive journal announcing an innovative, new cooling system in the Corvette that was

identical to the aqueous reverse flow cooling system that he had demonstrated to General Motors in 1989. He testified that only after he read the story did he realize that someone must have broken into the test car on the night of March 16, 1989, approximately two and one-half years earlier, to examine the secret technology.[2]

In 1994, Evans commenced this action against General Motors seeking to recover damages[3] for: (1) misappropriation of a trade secret in violation of the Connecticut Uniform Trade Secrets Act (CUTSA), General Statutes § 35-50 et seq.; (2) misappropriation of a trade secret under the common law of Michigan; (3) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; (4) breach of contract; and (5) breach of the implied covenant of good faith and fair dealing. The action was removed to the United States District Court for the District of Connecticut, which subsequently remanded the case to the Superior Court after determining that the patent Evans had obtained for the allegedly misappropriated technology was invalid. In March, 1999, the plaintiffs claimed the case for a jury trial.

In January, 2003, on the eve of trial, General Motors admitted in a hearing before the court that, in the course of the federal and state litigation, John Juriga, a General Motors employee, had forged certain evidence purporting to show that the company independently had

[2] Evans claims that, on the morning of March 17, 1989, he noticed that an access panel in the testing room floor, located directly under the car, had been lowered during the night, indicating that someone may have been in the room with the car. When he mentioned this to General Motors, however, he was assured that the panel had been moved as part of its routine maintenance.

[3] In their amended complaint, the plaintiffs sought actual damages, damages for unjust enrichment, future actual damages, future damages for unjust enrichment, punitive or exemplary damages, recovery of costs and attorney's fees, prejudgment interest and such other relief as the court deemed just and proper.

developed the reverse flow cooling system used in its "Gen II" engine. General Motors further admitted that Juriga and another employee, Al Schaefer, had given perjured deposition testimony about the company's independent development of the system.

Following disclosure of the forged evidence and perjured testimony, General Motors filed a motion in limine on January 27, 2003, requesting a trial to the court on the trade secret claims. The plaintiffs opposed the motion, arguing in a thirteen page memorandum of law that they had a statutory and constitutional right to a jury trial on those claims. On February 5, 2003, the court issued a memorandum of decision in which it made a "preliminary determination" that the trade secret claims should be severed from the plaintiffs' other claims and tried to the court.[4] The court also stated that, because all of the plaintiffs' essential claims "appear[ed] to be related to [the] trade secret [issue]," resolution of that issue "would likely resolve the case." The court invited written comment on its "proposal" no later than February 10, 2003.[5]

[4] Although the docket summary indicates that the court did not rule on General Motors' motion in limine, the court's February 5 memorandum of decision had the same effect as a ruling to grant the motion, insofar as it proposed a trial to the court.

[5] The court specifically concluded: "The court has made a preliminary determination that the plaintiffs' trade secret claims must be tried courtside. This would not be the case as to the plaintiffs' other claims. The court is considering commencing evidence on the plaintiffs' trade secret . . . and sanctions claims on March 20, 2003. The other claims could be severed for a jury trial, if necessary.

"The plaintiffs' essential claims appear to be related to trade secret misappropriation. The resolution of such issue would likely resolve the case.

"Proceeding with the trade secret claims by courtside trial also would provide the plaintiffs with a forum for their sanctions claims. The court and a jury could hear all of the plaintiffs' complaint simultaneously, but not the sanctions claims.

"If we proceed with a jury trial in March, we would not have the opportunity for a sanctions hearing, unless the trial were delayed.

"Proceeding with evidence on both the sanctions and trade secret claims before the court in March offers an opportunity to resolve the essential issues on the merits at the earliest date.

In their response to the court's memorandum, the plaintiffs stated that they were "willing to proceed according to the [c]ourt's proposal, as long as concession to [the] proposal is not construed as a waiver of [the] [p]laintiffs' right to a jury trial on any claims for which [the] plaintiffs are entitled to such right." General Motors likewise agreed to the proposal, urging the court to "confirm and make final" its February 5, 2003 "[d]ecision" to hold a trial to the court on the trade secret claims.

On February 10, 2003, the plaintiffs filed a motion requesting that the court impose sanctions on General Motors for fabricating evidence and giving false testimony. The plaintiffs specifically requested that the court render a default judgment as to liability against General Motors on all counts or preclude General Motors from advancing arguments or introducing evidence at trial regarding its prior, independent development of Evans' technology. On February 11, 2003, the court ordered that the trade secret and sanctions claims be tried simultaneously to the court and that the plaintiffs' other claims be severed for a subsequent jury trial, if necessary.

The trial commenced on March 7, 2003, and lasted more than four weeks. Substantial posttrial briefing followed. On August 29, 2003, the court issued a memorandum of decision in which it concluded that the plaintiffs' trade secret claims were barred by General Motors' special defenses of license and release. The court also awarded the plaintiffs $556,000 in attorney's fees and costs for General Motors' discovery abuse. Thereafter, the court entered a stipulated order on the sanctions award and rendered judgment for General Motors on

"The parties are invited to comment on this proposal in writing by February 10, 2003 . . . ."

the plaintiffs' amended complaint.[6] The plaintiffs did not seek a trial on their claims alleging a CUTPA violation, breach of contract and breach of the implied covenant of good faith and fair dealing. This appeal followed.

## I

The plaintiffs first claim that the trial court improperly denied them a jury trial on their trade secret claims. They argue that they are entitled to a jury trial under the Connecticut constitution and that all other jurisdictions that have considered the issue recognize the right to a jury trial on trade secret claims seeking monetary relief. General Motors responds that the plaintiffs waived their right to appeal from the trial court's decision on the jury trial issue when they voluntarily agreed to a trial to the court. Accordingly, in General Motors' view, there is no final order from which the plaintiffs may appeal. General Motors also argues that, even without these procedural obstacles, there is no constitutional right to a jury trial on claims for damages under CUTSA. We agree with the plaintiffs.

## A

We begin by considering whether the plaintiffs properly preserved their right to appeal the jury trial issue. General Motors argues that the plaintiffs' conduct constitutes a waiver of any jury trial claim that they otherwise might have had because they consented in writing to a trial to the court and did not assert their right to a jury trial at any other time during the proceedings. We disagree.

"[T]he right to a jury trial is a right which, like other rights, may be waived but . . . is a right the waiver of

---

[6] On November 14, 2003, the plaintiffs filed a motion for articulation of the trial court's decision to conduct a bench trial on the trade secret claims. The trial court denied the motion. The plaintiffs filed a motion for review of that decision with the Appellate Court, which granted the motion but denied the relief requested.

which is not to be inferred without reasonably clear evidence of the intent to waive." *Krupa* v. *Farmington River Power Co.*, 147 Conn. 153, 156, 157 A.2d 914 (1959), appeal dismissed and cert. denied, 364 U.S. 506, 81 S. Ct. 281, 5 L. Ed. 2d 258 (1960). In the present case, such evidence is lacking. The plaintiffs initially requested a jury trial in March, 1999. When General Motors filed a motion in limine on the eve of trial seeking a trial to the court, the plaintiffs strenuously objected in a thirteen page memorandum of law. Thereafter, they affirmatively asserted their right to a jury trial when they acceded to the court's proposal only "*as long as concession to this proposal is not construed as a waiver of [the] [p]laintiffs' right to a jury trial on any claims for which [the] plaintiffs are entitled to such right.*" (Emphasis added.) On appeal, the plaintiffs also filed a motion for articulation in August, 2004, requesting an explanation as to why the trial court had not granted a jury trial on their trade secret claims. When the court denied that motion, the plaintiffs pressed unsuccessfully for reversal of the decision by filing a motion for review with the Appellate Court. Accordingly, we conclude that the plaintiffs did not waive their right to a jury trial, either expressly or by implication, but actively sought to preserve the right from the time they first requested a jury trial in March, 1999, until their filing of a motion for review more than five years later.

General Motors' reliance on *Keating* v. *Glass Container Corp.*, 197 Conn. 428, 497 A.2d 763 (1985), for the proposition that the plaintiffs waived their right to a jury trial is misplaced. In that case, one of the defendants, Pepsi-Cola Bottling Company of New Haven, Inc. (Pepsi), appealed from an unfavorable judgment on its cross complaint against another defendant in a products liability action, claiming that the trial court improperly ruled that Pepsi had no right to a jury

trial on the cross complaint. Id., 430. Relying on the principle that a claim of error will not be considered unless the claim was distinctly raised at trial and was ruled on and decided adversely to the appellant, we found no error because Pepsi had not raised a timely objection to the trial court's decision, and the record was inadequate for review. See id., 430–31; see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial"). Although we noted that the trial court had sent a letter to all attorneys of record that the parties were not entitled to a jury trial on the cross complaint and that Pepsi's counsel had responded that his client did not wish to waive its jury trial right; *Keating* v. *Glass Container Corp.*, supra, 431–32; we disagreed with Pepsi's characterization of the letter as an order and of its counsel's letter to the court as an objection. Id., 432. We instead observed that, if Pepsi had wanted to preserve the issue for appeal, it should have placed a formal objection on the record and sought a determination by the court. Id., 432–33. We further noted that Pepsi had ignored several opportunities to request a jury trial during the proceedings. Id., 433–34.

The present case is distinguishable from *Keating* because, after General Motors filed a motion in limine seeking a trial to the court, the plaintiffs formally declared their opposition to the motion in a detailed memorandum of law, and the court effectively ruled on that motion by granting it in a subsequent memorandum and order. See part I B of this opinion. Accordingly, General Motors distinctly raised the issue of a jury trial, and the trial court decided that issue adversely to the plaintiffs after they formally objected.[7] As a result, the

---

[7] For the same reason, we reject General Motors' reliance on the federal rule that "[p]articipation in a bench trial without objection constitutes waiver of the jury trial right." *Royal American Managers, Inc.* v. *IRC Holding Corp.*, 885 F.2d 1011, 1018 (2d Cir. 1989).

plaintiffs cannot be deemed to have waived their right to a jury trial as Pepsi did in *Keating*.

## B

We next consider General Motors' claim that there is no final order on the jury trial issue from which the plaintiffs may appeal. General Motors argues that the trial court's memorandum of decision, in which the court invited the parties to comment on its "proposal," was not an appealable final ruling because the court characterized its decision as a "preliminary determination." This claim has no merit.

"[T]he statutory right to appeal is limited to appeals by aggrieved parties from final judgments . . . . Because our jurisdiction over appeals . . . is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim." (Citations omitted; internal quotation marks omitted.) *Hartford Steam Boiler Inspection & Ins. Co. v. Underwriters at Lloyd's & Cos. Collective*, 271 Conn. 474, 495, 857 A.2d 893 (2004), cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005).

In the present case, we conclude that the trial court rendered a final judgment for purposes of appeal. We first note that the February 5, 2003 memorandum is not a model of clarity in that the initial sentence refers to the court's decision as a "preliminary determination" but also declares that "the plaintiffs' trade secret claims *must be tried courtside*." (Emphasis added.) Moreover, the memorandum concludes with an invitation to the parties for written comment on the "proposal" contained therein. This ambiguity is erased, however, by the court's subsequent order of February 11, 2003, which provides that "[t]he hearing on the plaintiffs' motion for sanctions and *the court trial of the plaintiffs' trade secret claims . . . will commence on February 18,*

*2003 . . .* and proceed through February 21, 2003. The *plaintiffs' other claims are severed for a subsequent jury trial, if necessary.*" (Emphasis added.) To the extent that the holding of the trial itself was not sufficiently convincing that the court made a definitive ruling on the jury trial issue, we are persuaded by the combined effect of the court's memorandum of decision and subsequent order that the trial court rendered a final judgment on the matter. We therefore conclude that there was no procedural bar to the plaintiffs' appeal from the trial court's decision on the jury trial issue.

### C

We now consider the plaintiffs' claim on its merits. The plaintiffs argue that they have a right under the Connecticut constitution to a jury trial on their trade secret claims because CUTSA, Connecticut's trade secrets statute, is rooted in the common law and the remedy they seek is legal rather than equitable in nature. General Motors responds that the plaintiffs have no constitutional right to a jury trial because claims for the misappropriation of trade secrets were not triable to a jury in 1818, when the Connecticut constitution was adopted. We agree with the plaintiffs.

We begin by examining whether the applicable statute may be construed so as to avoid the constitutional question. See *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002) ("We . . . do not engage in addressing constitutional questions unless their resolution is unavoidable. 'Ordinarily, [c]onstitutional issues are not considered unless absolutely necessary to the decision of a case . . . .' "); see also *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U.S. 340, 345, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998) (court first must ascertain whether construction of applicable statute is fairly possible to avoid constitutional question). In the present case, the relevant CUTSA provision is General Statutes

§ 35-53,[8] which permits a plaintiff to seek, in addition to or in lieu of injunctive relief, damages for actual loss and unjust enrichment not considered in computing damages for actual loss. Moreover, a plaintiff may seek punitive damages for wilful and malicious misappropriation and reasonable attorney's fees. General Statutes § 35-53 (b). There is no language in this or any other provision of CUTSA relating to juries or jury trials, or suggesting that there is a statutory right to a jury trial. Accordingly, it is proper to consider whether the right to a jury trial on trade secret claims is guaranteed under the Connecticut constitution.

Article first, § 19, of the Connecticut constitution provides that "[t]he right of trial by jury shall remain inviolate."[9] "This particular provision of our constitution has been consistently construed by Connecticut courts to mean that if there was a right to a trial by jury at the time of the adoption of the provision, then that right remains intact. . . . It is generally held that the right to a jury trial exists not only in cases in which it existed at common law and at the time of the adoption of [the] constitutional provisions preserving it, but also exists in cases substantially [similar] thereto. . . . At common law, legal claims [were] tried by a jury . . . [and] equitable claims [were] tried by a court . . . . Equita-

---

[8] General Statutes § 35-53 provides: "(a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

"(b) In any action brought pursuant to subsection (a) of this section, if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection (a) and may award reasonable attorney's fees to the prevailing party."

[9] Although article first, § 19, was subsequently amended by article four of the amendments to the Connecticut constitution, that amendment did not affect the general right to a trial by jury.

ble actions, therefore, are not within the constitutional guarantee of trial by jury. . . .

"Accordingly, in determining whether a party has a right to a trial by jury under the state constitution . . . the court must ascertain whether the action being tried is similar in nature to an action that could have been tried to a jury in 1818 when the state constitution was adopted. This test requires an inquiry as to whether the course of action has roots in the common law, and if so, whether the remedy involved was one in law or equity. If the action existed at common law and involved a legal remedy, the right to a jury trial exists and the legislature may not curtail that right either directly or indirectly. . . .

"The historical test we apply is flexible and may require a jury in a new cause of action, not in existence in [1818], if it involves rights and remedies of the sort traditionally enforced in an action at law or if its nearest historical analogue is an action at common law." (Citations omitted; internal quotation marks omitted.) *Skinner* v. *Angliker*, 211 Conn. 370, 373–77, 559 A.2d 701 (1989). In determining whether an action existed at common law and involved a legal remedy, we look for guidance to Connecticut case law, to the common law of England and to federal and state jurisdictions that have considered the question. Cf. *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 72, 808 A.2d 1107 (2002).

In the present case, all of the available evidence suggests that claims alleging the improper disclosure of a trade secret were recognized at common law and tried before juries in English courts when the Connecticut constitution was adopted in 1818.[10] The earliest pub-

---

[10] The first Connecticut case involving a claim for the improper disclosure of a trade secret was decided in 1890. See *Wm. Rogers Mfg. Co.* v. *Rogers*, 58 Conn. 356, 366, 20 A. 467 (1890) ("[the plaintiffs] have not shown facts which bring the case within any rule that would require an employee to be enjoined from disclosing business secrets which he has learned in the course of his employment and which he has contracted not to divulge").

lished opinion to consider the issue was *Newbery* v. *James*, 35 Eng. Rep. 1011 (Ch. 1817), in which the plaintiffs sought to continue an injunction restraining the defendants from disclosing a secret involving the manufacture of a certain medicine. See id., 1012. The court observed that it could not decide whether the parties' agreement to maintain the secret had been violated unless the secret was disclosed to the court. See id., 1013. Disclosure of the secret, however, would defeat the purpose of the injunctive relief requested. See id. The court concluded that it "could do nothing but put the parties in a way to try their legal rights by an action."[11] Id. It therefore dissolved the injunction, ordered the defendants to keep an accounting of what they sold while the parties tried their rights and proceeded to expedite the matter by removing a procedural obstacle arising from the fact that the plaintiff was also one of the executors for the named defendant, who then was deceased.[12] Id. There is no hint in *Newbery* that the court's directive for the parties to bring an action in a court of law was in any way unusual. We thus conclude, on the basis of *Newbery*, that, although plaintiffs in the early nineteenth century could seek injunctive relief in courts of equity to restrain defendants from misappropriating business secrets, English courts of law during that time also conducted jury trials on trade secret claims seeking damages.

---

[11] Citing *Newbury*, a New York court in an early case also deemed injunctive relief an improper remedy, stating that an action in damages was the only redress available to the plaintiff. *Deming* v. *Chapman*, 11 How. Pr. 382, 384 (N.Y. Sup. 1854).

[12] In several cases following *Newbery*, the courts likewise considered injunctive relief to restrain defendants from divulging secrets involving the manufacture of medicines. See *Williams* v. *Williams*, 36 Eng. Rep. 61, 62 (Ch. 1817); *Yovatt* v. *Winyard*, 37 Eng. Rep. 425, 426 (Ch. 1820); *Morison* v. *Moat*, 68 Eng. Rep. 492, 500–503 (V.C. 1851). The courts in those cases, however, made no reference to other possible remedies for resolving the parties' disputes.

This conclusion is consistent with case law recognizing that substantially similar claims of copyright and patent infringement, the closest historical analogue to trade secret claims, were tried before juries in eighteenth century courts of law. See, e.g., *Feltner* v. *Columbia Pictures Television, Inc.*, supra, 523 U.S. 348–49 ("[b]efore the adoption of the [s]eventh [a]mendment [in 1791] . . . copyright suits for monetary damages were tried in courts of law, and thus before juries"); *Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370, 377, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) (recognizing "descent of today's patent infringement action from the infringement actions tried at law in the [eighteenth] century," and declaring that "there is no dispute that [patent] infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago"). Moreover, there is "overwhelming evidence that the consistent practice at common law was for juries to award damages." *Feltner* v. *Columbia Pictures Television, Inc.*, supra, 353. Consequently, the fact that two closely related causes of action seeking protection of intellectual property rights existed at common law and were tried before juries prior to the adoption of the Connecticut constitution reinforces our determination in the present case that the plaintiffs have a right to a jury trial on their trade secret claims.

We also note that the Connecticut statutory scheme in effect when the state constitution was adopted distinguished between equitable and legal claims, and provided for a jury trial when plaintiffs sought an award of damages. See Act for the Directing and Regulating of Civil Actions, Connecticut Acts and Laws (1805) ¶ 8, pp. 26–27. The governing law provided in relevant part: "[A]ll Actions that shall be tried before the Superior or County Courts, when Issue is joined on any Matter of Fact, shall be tried by a Jury of twelve Men of the Neighbourhood, qualified, impannelled, and sworn

according to Law, who shall find the Matter in Issue, with the Debt or Damages, and Cost according to Law and their Evidence; and the Judges shall make up and declare the Sentence thereon: And every Case wherein the Parties shall join in Demurer in Law, shall be heard and determined by the Judges; and if there be any Matter of apparent Equity, as upon the Forfeiture of a Bond or Obligation, or Breach of Covenant without Damage, or the like, the Judges shall determine such Matter of Equity . . . .

"Provided nevertheless, That in all Actions which may be brought or come before the said Superior or County Courts in the due Course of Law, *wherein the Parties shall join Issue on any Matter of Fact, and agree and do put themselves on the Court for Trial of such Issue*; the Judges of said respective Courts, having Jurisdiction of such Action or Actions, may and shall proceed to hear and try the same without a Jury, and to award Damages and Costs, and grant Execution thereon; any Thing before to the contrary notwithstanding." (Emphasis added.) Id.

As a result, even in the absence of specific case law or legislative guidance in Connecticut concerning trade secret claims in the early nineteenth century, it appears that plaintiffs seeking damages in an action at law prior to the adoption of the state constitution, including those seeking damages for the misappropriation of a trade secret, would have had a statutory right to a jury trial under the law in effect at that time, and that such a matter would be tried to the court only upon agreement of the parties.

The conclusion we reach today satisfies the rule of construction that CUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this [act] among states enacting it." General Statutes § 35-58; cf. *Hill* v.

*Blake*, 186 Conn. 404, 408, 441 A.2d 841 (1982) ("[when an] act is a uniform law, decisions from other states are valuable for the interpretation of its provisions"). Although the Uniform Trade Secrets Act is silent on the issue of jury trials, other jurisdictions that have enacted civil statutes based on the uniform act[13] permit juries not only to make factual determinations on questions of liability, but also to decide the nature and

---

[13] Forty-four states and the District of Columbia have enacted civil statutes defining trade secrets based on the Uniform Trade Secrets Act. Ala. Code § 8-27-1 et seq. (2002); Alaska Stat. § 45.50.910 et seq. (2004); Ariz. Rev. Stat. Ann. § 44-401 et seq. (2003); Ark. Code Ann. § 4-75-601 et seq. (2001); Cal. Civ. Code § 3426 et seq. (Deering Sup. 2005); Colo. Rev. Stat. Ann. § 7-74-101 et seq. (2005); General Statutes § 35-51 et seq.; Del. Code Ann. tit. 6, § 2001 et seq. (2005); D.C. Code Ann. § 36-401 et seq. (LexisNexis 2001); Fla. Stat. § 688.001 et seq. (2005); Ga. Code Ann. § 10-1-760 et seq. (2000); Haw. Rev. Stat. § 482B-1 et seq. (1993); Idaho Code § 48-801 et seq. (2003); 765 Ill. Comp. Stat. Ann. § 1065/1 et seq. (West 2001); Ind. Code Ann. § 24-2-3-1 et seq. (LexisNexis 1996); Iowa Code § 550.1 et seq. (2001); Kan. Stat. Ann. § 60-3320 et seq. (1994); Ky. Rev. Stat. Ann. § 365.880 et seq. (LexisNexis 2002); La. Rev. Stat. Ann. § 51:1431 et seq. (2003); Me. Rev. Stat. Ann. tit. 10, § 1541 et seq. (1997); Md. Code Ann., Com. Law § 11-1201 et seq. (LexisNexis 2005); Mich. Comp. Laws Serv. § 445.1901 et seq. (LexisNexis 2001); Minn. Stat. Ann. § 325C.01 et seq. (West 2004); Miss. Code Ann. § 75-26-1 et seq. (2000); Mo. Rev. Stat. § 417.450 et seq. (2000); Mont. Code Ann. § 30-14-401 et seq. (2005); Neb. Rev. Stat. § 87-501 et seq. (1999); Nev. Rev. Stat. § 600A.010 et seq. (2003); N.H. Rev. Stat. Ann. § 350-B:1 et seq. (LexisNexis 1995); N.M. Stat. Ann. § 57-3A-1 et seq. (LexisNexis 2000); N.C. Gen. Stat. § 66-152 et seq. (2005); N.D. Cent. Code § 47-25.1 et seq. (1999); Ohio Rev. Code Ann. § 1333.61 et seq. (West 2004); Okla. Stat. Ann. tit. 78, § 85 et seq. (West 2002); Or. Rev. Stat. § 646.461 et seq. (2003); 12 Pa. Cons. Stat. Ann. § 5301 et seq. (West Sup. 2005); R.I. Gen. Laws § 6-41-1 et seq. (2001); S.C. Code Ann. § 39-8-1 et seq. (Sup. 2000); S.D. Codified Laws § 37-29-1 et seq. (2000); Tenn. Code Ann. § 47-25-1701 et seq. (2001); Utah Code Ann. § 13-24-1 et seq. (2005); Va. Code Ann. § 59.1-336 et seq. (2001); Wash. Rev. Code § 19.108.010 et seq. (2004); W. Va. Code Ann. § 47-22-1 et seq. (LexisNexis 1999); Wis. Stat. § 134.90 et seq. (2003–2004). Of the remaining states, Massachusetts, New Jersey, Texas and Wyoming have enacted criminal statutes prohibiting the theft of trade secrets but no civil trade secret statutes of general application. See Mass. Ann. Laws ch. 266, §§ 30 (4) and 60A (LexisNexis 2002); N.J. Stat. Ann. § 2C:20-1 et seq. (West 2005); Tex. Penal Code Ann. § 31.05 (2003); Wyo. Stat. Ann. § 6-3-502 (a) (iii) (2005). New York and Vermont have not enacted any statutes defining trade secrets.

amount of damages, if any, awarded to plaintiffs.[14] See, e.g., *Bacon* v. *Volvo Service Center, Inc.*, 266 Ga. App. 543, 543–44, 597 S.E.2d 440 (2004), cert. denied, Docket No. SO4C1341, 2004 Ga. LEXIS 753 (September 7, 2004); *SDT Industries, Inc.* v. *Leeper*, 793 So. 2d 327, 330 (La. App.), cert. denied, 803 So. 2d 973 (La. 2001); *Eagle Group, Inc.* v. *Pullen*, 114 Wash. App. 409, 420–21, 58 P.3d 292 (2002), review denied, 149 Wash. 2d 1034, 75 P.3d 968 (2003). But see *Infinity Products, Inc.* v. *Quandt*, 775 N.E.2d 1144, 1149 (Ind. App. 2002) (trial court determined that defendant had misappropriated trade secrets and awarded plaintiff damages on basis of that finding), vacated on other grounds, 810 N.E.2d 1028 (Ind. 2004).

General Motors nonetheless contends that Connecticut plaintiffs seeking damages for the misappropriation of trade secrets have no constitutional right to a jury trial because there is no published opinion from any jurisdiction in which a trade secret claim was actively tried to a jury prior to adoption of the Connecticut constitution. General Motors further contends that *Newbery* fails to establish that trade secret claims have common-law roots because *Newbery* was decided by England's Court of Chancery and makes no mention of a jury trial right. We reject this claim. The fact that the plaintiffs in *Newbery* sought injunctive relief in the Court of Chancery and that there was no specific reference to a jury trial in the published opinion is irrelevant. *Newbery* is significant *precisely because* the Court of Chancery determined that it was unable to resolve the parties' dispute. Moreover, it was well understood under common law that "try[ing] [the parties'] legal rights by an action"; *Newbury* v. *James*, supra, 35 Eng. Rep. 1013; referred to a trial by a jury. See *Skinner* v. *Angliker*, supra, 211 Conn. 374. Consequently, the

[14] To our knowledge, however, no court expressly has stated that plaintiffs have a right to a jury trial on trade secret claims seeking damages.

court's declaration in *Newbery* v. *James*, supra, 1013, that the parties should "try their legal rights by [means of] an action" supports the conclusion that trade secret claims for damages were triable to juries in courts of law prior to the adoption of the Connecticut constitution. Cf. *Bickell* v. *Moraio*, 117 Conn. 176, 187, 167 A. 722 (1933) (court of equity may decline to grant injunctive relief and "remit the plaintiffs to an action at law to recover damages").

General Motors insists that *Newbery* fails to provide a definitive answer to whether the common law of England recognized trade secret claims prior to 1818 because, shortly thereafter, the Court of Chancery declined to recognize a similar claim alleging the disclosure of a trade secret in *Williams* v. *Williams*, 36 Eng. Rep. 61 (Ch. 1817). In *Williams*, however, the court did not decline to recognize the plaintiff's trade secret claim but merely decided not to exercise its equitable powers to continue an injunction restraining the defendants and their agents from divulging the secret in question. See id., 62. The court reasoned, as in *Newbery*, that, if the defendant already had disclosed the secret to others, an injunction would be useless. Id. If, on the other hand, the defendant had not disclosed the secret, the court would be required to examine it in order to adjudicate the claim. See id. The court thus determined that injunctive relief was inappropriate, although it did not go so far as to recommend that the plaintiff pursue a legal remedy. Accordingly, *Williams* in no way diminishes or undermines the conclusion that we draw from *Newbery*, namely, that trade secret claims were tried by juries in early nineteenth century English courts of law.

We are equally unpersuaded by General Motors' contention that we previously have viewed trade secret cases as classically equitable actions arising out of a breach of confidence or trust rather than as actions at

law. In the cases cited by General Motors, the relief sought by the plaintiffs was primarily injunctive. See *Plastic & Metal Fabricators, Inc.* v. *Roy*, 163 Conn. 257, 259, 303 A.2d 725 (1972); *Allen Mfg. Co.* v. *Loika*, 145 Conn. 509, 513, 144 A.2d 306 (1958); *Schavoir* v. *American Re-Bonded Leather Co.*, 104 Conn. 472, 477–78, 133 A. 582 (1926). To the extent that we described the claims in those cases as equitable in nature, it was not because we *chose* to characterize them as equitable rather than legal but because the relief that the plaintiffs had requested was principally equitable, and the claims could not be characterized accurately in any other way. In contrast, the plaintiffs in the present case seek only monetary relief. This court has viewed claims for monetary relief as generally legal in nature for more than a century. See *Muller* v. *Witte*, 78 Conn. 495, 498, 62 A. 756 (1906) (claim for monetary relief "must be regarded as an action at law, and not a proceeding in equity"), citing *Baxter* v. *Camp*, 71 Conn. 245, 41 A. 803 (1898). Moreover, even in situations in which "separate and distinct causes of action are joined, one at law and one in equity, either party has the right to have a jury trial of the issues involved in the cause of action at law. . . . So where there is involved in a case a cause of action for damages properly cognizable at law, the fact that relief in equity in aid of or supplemental to it is also demanded will not destroy the right of either party to have the issues at law submitted to the jury. . . . On the other hand, where the essential right asserted is equitable in its nature and damages are sought in lieu of equitable relief or as supplemental to it in order to make that relief complete, the whole action is one in equity and there is no right to a jury trial. . . . In that case we [have] said . . . [that] [t]he complaint was one in equity . . . . Such a cause of action is not of right triable by jury, although the court has a discretion to submit issues arising in it to a jury." (Citations omitted;

internal quotation marks omitted.) *Berry* v. *Hartford National Bank & Trust Co.*, 125 Conn. 615, 618–19, 7 A.2d 847 (1939). Accordingly, a review of the relevant case law suggests that, because the present case is properly characterized as an action sounding in damages, the plaintiffs have a right to a jury trial.

The fact that CUTSA does not provide for a jury trial on trade secret claims is of no consequence. As we noted previously, even in the absence of an explicit statutory provision, the right to a jury trial may be preserved under the Connecticut constitution if the cause of action is rooted in the common law and the remedy sought is legal. In addition, the prefatory note to the Uniform Trade Secrets Act, upon which CUTSA is based, provides that the uniform act "codifies the basic principles of common law trade secret protection . . . ." Unif. Trade Secrets Act, prefatory note (amended 1985), 14 U.L.A. 531 (2005). An examination of CUTSA and the Uniform Trade Secrets Act therefore supports our conclusion that trade secret protection was available under the common law and, as a result, the plaintiffs have a right to a jury trial on their trade secret claims seeking damages.

We also reject the notion that our past interpretation of CUTPA, a similar statutory scheme, has any relevance in the present case. In *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 150, 645 A.2d 505 (1994), we considered whether the state constitution guarantees the right to a jury trial for CUTPA claims before the statute was amended to provide for a jury trial. We stated that "statutory actions established since the adoption of the constitution of 1818 ordinarily fall outside the scope of the [constitutional jury trial] provision." (Internal quotation marks omitted.) Id., 154. We then concluded that, "[b]ecause CUTPA creates an essentially equitable cause of action *not substantially similar to common*

*law claims triable to a jury prior to 1818 . . .* a jury trial is not constitutionally required for actions brought under CUTPA." (Emphasis added.) Id., 155. Actions seeking damages under CUTSA, however, are rooted in the common law and thus do not fall outside the scope of the jury trial provision of the Connecticut constitution. Accordingly, our decisions interpreting CUTPA on the jury trial issue are not compelling authority in the present circumstances.

General Motors finally argues that the only Connecticut court to address the issue has determined that there is no constitutional right to a jury trial under CUTSA. See *Pepe & Hazard* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV960151601S (October 15, 2002) (33 Conn. L. Rptr. 254). This argument has no merit. A lower court decision is not binding precedent on this court. See, e.g., *J. M. Lynne Co.* v. *Geraghty*, 204 Conn. 361, 369, 528 A.2d 786 (1987). More significantly, because the court in *Jones* compared CUTSA to the preamendment version of CUTPA; see *Pepe & Hazard* v. *Jones*, supra, 254–55; the comparison is inapposite for all of the reasons that we previously have described. Therefore, we conclude that the trial court improperly denied the plaintiffs their right to a jury trial on their trade secret claims and reverse that part of the judgment.[15]

## II

The plaintiffs next contend that the trial court failed to apply the proper legal standard in imposing sanctions

[15] In light of our conclusion, there is no need to address the plaintiffs' claim that the trial court improperly determined that General Motors' special defenses of license and release barred the plaintiffs' trade secret claims because a jury will consider the evidence relating to those defenses when the case is tried on remand. For similar reasons, it is not necessary to address the plaintiffs' claim that the trial court improperly precluded them from introducing evidence that the technology used in General Motors' "Gen III" engines was substantially derived from the allegedly stolen secret.

on General Motors for its discovery abuse.[16] They claim that General Motors received a mere "slap on the wrist" when the court awarded them only $556,000 in attorney's fees and costs, and that the court's decision not to render a default judgment was based on the erroneous legal conclusion that General Motors "bore no responsibility for [its employees' misconduct] because it was a large corporation whose 'chiefs' were not implicated." The plaintiffs argue that Juriga, a key engineer and designated witness for the company,[17] acted on General Motors' behalf, and, therefore, Juriga's misconduct is "per se attributable" to the company by virtue of his designated authority as a company witness. General Motors responds that the plaintiffs' attempt to cast the trial court's failure to render a default judgment as a legal error ignores the detailed factual findings on which the sanctions were based, and that when these findings are taken into account, it cannot be said that the trial court abused its discretion in declining to render a default judgment against General Motors. We agree with General Motors.

On January, 15, 2003, General Motors requested an immediate conference with the court to address a "matter of grave importance . . . ." (Internal quotation marks omitted.) The court granted the request and held a hearing on January 23, 2003, during which counsel for General Motors represented that certain deposition testimony and evidence produced by its employees during discovery was of questionable veracity and authen-

---

[16] Although the trial court heard the sanctions and trade secret claims simultaneously, the court considered the motion for sanctions independently of the trade secret claims, and our review of the trial court's sanctions award will have no effect on the new trial.

[17] General Motors' corporate counsel referred to Juriga as General Motors' "designee" for the purpose of responding to the notice of deposition and subpoena duces tecum issued to General Motors. Shortly thereafter, when the plaintiffs' counsel asked Juriga if he was "a corporate representative of General Motors," he responded in the affirmative.

ticity. Following these admissions by General Motors, the plaintiffs filed a motion to reopen discovery for the purpose of exploring the level of General Motors' involvement in fabricating evidence. On February 5, 2003, the court granted the plaintiffs' motion as to the majority of their discovery requests and ordered compliance within ten days to ensure that the trial would proceed as scheduled.

Thereafter, the plaintiffs filed a motion on February 7, 2003, seeking, inter alia, a judgment of default against General Motors for its employees' misconduct. The court considered the motion simultaneously with the plaintiffs' trade secret claims and concluded as follows in its August 29, 2003 memorandum of decision: "The court declined for several reasons to sanction General Motors by entering a default on liability, in keeping with a general policy against forfeiture. . . . [B]y an order filed February 5, 2003, the plaintiff[s] [were] afforded an opportunity to reopen discovery and explore the level of General [Motors'] involvement in the manufacture of fraudulent evidence. The plaintiff[s] [were] unable to demonstrate after such discovery that the sanctionable conduct went beyond [Juriga] and Schaefer's level of participation.

"In its determination whether to sanction [General Motors], the court considered that Juriga was a professional employee of General Motors with substantial responsibility in the development of the Gen II engines; however, he was not a [high ranking] officer or someone who could establish policy for the company. Schaefer was an hourly employee in the position of a skilled toolmaker. Juriga, in admitting his fraudulent behavior, indicated that only he and Schaefer were involved. There is not sufficient evidence to hold other General Motors employees responsible for the fraud.

"Also critical to the court's determination not to sanction General Motors by an entry of judgment against it

is the fact that the fraud was disclosed by General [Motors'] counsel. . . . Although there were certainly grounds for suspecting that the Juriga and Schaefer evidence was not legitimate, the facts were not known to [General Motors'] counsel until a meeting in January of this year, and were immediately disclosed to the court. The interview with . . . Juriga occurred on January 14, 2003. At that meeting, Juriga made statements which led trial counsel to believe that the ['avoid verbal order'] of July 13, 1988, was of questionable authenticity. On that day, Juriga was advised to seek independent counsel and was suspended from his employment with General Motors. On January 15, 2003, the court was notified and a conference was requested concerning a 'matter of grave importance with reference to [Rule] of Professional Conduct 3.3[18] . . . .' In light of such ethical conduct by [General Motors'] trial counsel, the court is not inclined to impose a sanction of judgment for liability against a large corporation whose chiefs have not been implicated and where hundreds of millions of dollars are being claimed.

* * *

"The court recognizes the expense incurred by the plaintiffs in responding to the fraudulent evidence of independent development. The court awards the plaintiffs their costs and [attorney's] fees incurred with respect to those efforts." (Citations omitted.)

It is well established that "a court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of [Practice Book] § 13-14,[19] impose sanc-

---

[18] Rule 3.3 of the Rules of Professional Conduct covers the subject of candor toward a tribunal.

[19] Practice Book § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production . . . or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply

tions . . . ." *Millbrook Owners Assn., Inc.* v. *Hamilton Standard,* 257 Conn. 1, 14, 776 A.2d 1115 (2001). The decision "to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court. . . . In reviewing a claim that this discretion has been abused the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness. . . . [T]he ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV,* supra, 230 Conn. 163–64.

"[T]he court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . The design of the rules of practice is both to facilitate business and to advance justice . . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an

---

with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply;

"(2) The award to the discovering party of the costs of the motion, including a reasonable attorney's fee;

"(3) The entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(4) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence;

"(5) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal. . . ."

abuse of discretion whe[n] a party shows a deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort." (Citations omitted; internal quotation marks omitted.) *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 16–17. The same principles are applicable to the entry of a default judgment.

In the present case, the trial court declined to render a default judgment against General Motors for several reasons, including: (1) the general policy against forfeiture on liability claims; (2) the fact that the plaintiffs were afforded an opportunity to reopen discovery and to explore General Motors' involvement in producing the fraudulent evidence; (3) its conclusion that Juriga and Schaefer acted independently and that no other higher level employees were implicated; and (4) the immediate disclosure of the fraudulent conduct to the court by General Motors' counsel following its discovery thereof. Making every reasonable presumption in favor of the correctness of the trial court's ruling, we conclude that the court was well within the bounds of its discretion in awarding the plaintiffs attorney's fees and costs and declining to render a default judgment against General Motors.

The plaintiffs argue that the trial court's decision was based on a legal error, namely, its conclusion that General Motors bore no responsibility for its employees' misconduct because it was a large corporation whose higher level employees were not implicated. This argument is unpersuasive.

The trial court's determination that the fraudulent conduct of Juriga and Schaefer did not extend to upper level management was not a legal conclusion but a factual determination based on testimony at the January 23, 2003 hearing and evidence admitted at trial. More-

over, the court did not find that General Motors bore no responsibility for the misdeeds of its employees, as the plaintiffs contend, but ordered General Motors to pay the plaintiffs $556,000 in attorney's fees and costs specifically *because* it recognized "the expense incurred by the plaintiffs in responding to the fraudulent evidence of independent development" of the disputed technology. Indeed, General Motors *itself* accepted responsibility for the transgressions of its employees when it declined to challenge the trial court's order. Furthermore, insofar as the plaintiffs argue that the sanctions were insufficient to punish General Motors, they cite no authority to support their claim that the false deposition testimony of Juriga, as the designated agent of General Motors, *required* the entry of a default judgment against the company.

The plaintiffs' reliance on *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U.S. 238, 64 S. Ct. 997, 88 L. Ed. 1250 (1944), is misplaced because, in that case, the court ordered that a judgment for the defendant obtained by fraud be set aside only after determining that the defendant was involved in "a deliberately planned and carefully executed scheme to defraud" the court that was not discovered until several years later. Id., 245. In the present case, only two General Motors employees, neither of whom were high ranking officers, were implicated in the fraud, General Motors informed the court of its employees' misconduct, and the court reopened discovery so that the plaintiffs could seek additional evidence on the matter prior to the commencement of trial. Consequently, unlike *Hazel-Atlas Glass Co.*, this case is not one in which the defendant showed "a deliberate, contumacious or unwarranted disregard for the court's authority"; (internal quotation marks omitted) *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 16; but one in which

the offending party disclosed the misconduct and cooperated so as to ameliorate its effect on the proceedings.

Furthermore, compelling authority exists to support the conclusion that sanctions *other than* a default judgment are appropriate in cases involving fabricated evidence and false deposition testimony. See, e.g., *Gonzalez* v. *Trinity Marine Group, Inc.*, 117 F.3d 894, 898–99 (5th Cir. 1997) (upholding District Court's decision to impose sanctions for perjury and fabrication of evidence but reversing specific sanction of dismissal with prejudice when District Court failed to find that lesser sanctions could not adequately address offending conduct); see also *Marfia* v. *T.C. Ziraat Bankasi, New York Branch*, 100 F.3d 243, 249 (2d Cir. 1996) (default judgment reversed as abuse of discretion because entry of default judgment is "most drastic remedy" and should be applied only in extreme circumstances [internal quotation marks omitted]). In addition, the plaintiffs do not claim that they were not adequately compensated for the resources that they had expended during discovery on matters pertaining to the fabricated evidence and false deposition testimony. Accordingly, we conclude that the trial court did not abuse its discretion in declining to render a default judgment against General Motors.

The judgment is reversed, except as to the award of sanctions, and the case is remanded for a new trial.

In this opinion the other justices concurred.