******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROGER EMERICK *v.* TOWN OF GLASTONBURY
(AC 38646)

DiPentima, C. J., and Sheldon and Bear, Js.

*Syllabus*

The self-represented plaintiff landowner brought this action for, inter alia, private nuisance against the defendant town, alleging that development upstream from his property had caused damage to wetlands on his property. The trial court rendered judgment dismissing the action as a sanction for the plaintiff's conduct during the five days of the jury trial, in which the plaintiff, inter alia, refused to accept the court's evidentiary rulings, interrupted and spoke over the court, called the court's rulings "bizarre," remarked that the court was "incompetent" and needed "to go back to law school," and accused the trial judge of speaking in "gibberish" and nodding her head as if she were "drugged." During the trial, the court employed a series of progressive steps to address the plaintiff's behavior, which included, inter alia, verbal warnings, and instructions to cease making comments about the court's evidentiary rulings and to cease interrupting the court and making insulting or disparaging remarks about the court and the defendant's counsel. The court also fined the plaintiff and advised him on multiple occasions that dismissal of the case was an option it would consider if he continued with his actions. On the plaintiff's appeal to this court, *held* that the trial court did not abuse its discretion in dismissing the plaintiff's action, as his continuing and deliberate misconduct during the trial, for which he bore sole responsibility, demonstrated such deliberate disregard for the court's orders as to warrant dismissal: the plaintiff did not demonstrate any mitigating factors for his actions during the trial, the court's use of escalating disciplinary steps to compel his observance of its orders proved unsuccessful, which left dismissal of the case as a last resort and the only reasonable remedy, the court's repeated warnings, suggestions and fines had no impact on the plaintiff, as he ignored the court's admonitions and continued to delay the trial, and there was no merit to the plaintiff's claims that the court did not adhere to standards of stare decisis, that the court dismissed the case on the basis of his claims of judicial bias or that the dismissal followed from a finding of contempt, as the dismissal was based on the court's inherent authority to compel observance of its rules and to deal with continuing misconduct; furthermore, the court did not fail to consider the plaintiff's motions for a mistrial or his requests that the court recuse itself, there were instances where the plaintiff raised his voice or challenged the court's evidentiary rulings in front of the jury, the absence of the jury when certain acts of misconduct occurred did not deprive the court of its authority to sanction the plaintiff for his continuing misconduct during the trial and lack of cooperation with the court, and the plaintiff's claim that the dismissal of his case violated his constitutional right to procedural due process was inadequately briefed and essentially restated his previous arguments, which this court had rejected.

Argued April 13—officially released October 31, 2017

*Procedural History*

Action to recover damages for, inter alia, private nuisance, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Wiese, J.,* denied the plaintiff's motion for summary judgment and granted in part the defendant's motion for summary judgment; thereafter, the matter was tried to the jury before *Peck, J.;* subsequently, the court, *Peck, J.,* denied the plaintiff's motions for a mistrial and rendered judgment of dismissal; thereafter, the court, *Peck, J.,* denied the plaintiff's motion to reargue, and

the plaintiff appealed to this court. *Affirmed.*

*Roger Emerick*, self-represented, the appellant (plaintiff).

*Kristan M. Maccini*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The trial court possesses the inherent power to impose sanctions on litigants in cases before it, including dismissing the case, both to compel observance of its rules and to bring an end to continuing violations of those rules. *D'Ascanio* v. *Toyota Industries Corp.*, 309 Conn. 663, 670–71, 72 A.3d 1019 (2013). This power "rests within the discretion of the trial court and will not be disturbed on review unless there is an abuse of discretion. . . . Generally, a sanction should not serve as a punishment or penalty. . . . Such drastic action is not, however, an abuse of discretion where a party shows a deliberate, contumacious or unwarranted disregard for the court's authority." (Citations omitted.) *Fox* v. *First Bank*, 198 Conn. 34, 39, 501 A.2d 747 (1985); see also *D'Ascanio* v. *Toyota Industries Corp.*, supra, 672; *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 16–17, 776 A.2d 1115 (2001). In the present case, the self-represented plaintiff, Roger Emerick, appeals from the judgment of the trial court dismissing his case against the defendant, the town of Glastonbury, as a sanction for his actions during trial. On appeal, the plaintiff claims that the dismissal constituted reversible error.[1] We are not persuaded that the court abused its discretion in dismissing the plaintiff's case after his deliberate, continuing, and at times contumacious disregard for the court's authority. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to our decision. The plaintiff commenced this action on February 15, 2011. In the operative complaint, he set forth claims against the defendant of private nuisance, reckless and wanton conduct, trespass, violation of General Statutes § 13a-138,[2] intentional infliction of emotional distress, negligent infliction of emotional distress and breach of fiduciary duty.[3] The plaintiff alleged that he owned 580 Hopewell Road in South Glastonbury, a forty acre property with wetlands along Roaring Brook. He claimed that development upstream from his property caused damage to Roaring Brook and his wetlands. The operative complaint was filed on October 29, 2013, and the defendant filed its answer and special defenses on November 13, 2013.

On November 3, 2014, the defendant filed a motion for summary judgment as to all counts. Two weeks later, the plaintiff filed his own motion for summary judgment on all counts. The parties filed various objections and replies to these motions, and the court, *Wiese, J.*, heard oral argument on the motions on January 26, 2015. On May 14, 2015, the court issued a memorandum of decision granting the defendant's motion with respect to the plaintiff's claims for damages for reckless and wanton conduct, violation of § 13a-138, negligent infliction of emotional distress, intentional infliction of emotional distress and breach of fiduciary duty but

denying it as to his claims for damages for private nuisance and trespass, and his claim for injunctive relief for intentional infliction of emotional distress. The plaintiff's motion for summary judgment was denied in its entirety.

The trial commenced on October 27, 2015, before Judge A. Susan Peck.[4] At the beginning of the trial, the court gave the jury preliminary instructions, including an estimation that the evidentiary phase of the trial would take three to four days. Following opening statements, the plaintiff called himself as a witness. He testified throughout the first and second days and the majority of the third day of the trial. Near the end of the third day, the plaintiff called Daniel A. Pennington, the defendant's town engineer and manager of physical services, as a witness. Pennington's testimony continued into the morning of the fourth day of trial.

On the afternoon of the fourth day, the court excused the jury to consider the defendant's objections to the plaintiff's expert witness, Sigrun N. Gadwa. At the outset of the fifth day of trial, the court permitted Gadwa to testify before the jury. During her testimony, the jury was excused so that the court could consider the objections by the defendant's counsel and the plaintiff's responses thereto. After an extended argument, the court focused on the plaintiff's behavior during the trial, finding that he had been insulting and abusive to the court and the defendant's counsel, resulting in a disruption of the administration of justice. After being interrupted by the plaintiff, the court further found that the plaintiff had exhibited a lack of respect for and refused to follow court rules, procedure and decorum. As a result of his misconduct during the course of the trial, the court dismissed the plaintiff's case. The plaintiff subsequently filed a motion to reargue, which the court denied. This appeal followed. Additional facts will be set forth as necessary.

As an initial matter, we set forth the legal principles and our standard of review. "It is well established that a court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of [Practice Book] § 13-14, impose sanctions . . . ." (Footnote omitted; internal quotation marks omitted.) *Evans* v. *General Motors Corp.*, 277 Conn. 496, 522–23, 893 A.2d 371 (2006); see also *DuBois* v. *William W. Backus Hospital*, 92 Conn. App. 743, 748, 887 A.2d 407 (2005) (trial court has inherent authority to impose sanctions), cert. denied, 278 Conn. 907, 899 A.2d 35 (2006). The sanction of "dismissal serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to [engage in] such conduct in the absence of such deterrent. *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976)." *Pavlinko*

v. *Yale-New Haven Hospital*, 192 Conn. 138, 145, 470 A.2d 246 (1984).

This case involves the inherent authority of the court to impose reasonable sanctions against a party during litigation. "The decision to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court. . . . In reviewing a claim that this discretion has been abused the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness. . . . [T]he ultimate issue is whether the court could reasonably conclude as it did. . . .

"At the same time, however, we also have stated: [D]iscretion imports something more than leeway in decision-making. . . . It means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In addition, the court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . The design of the rules of practice is both to facilitate business and to advance justice; they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice. . . . Rules are a means to justice, and not an end in themselves . . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows a deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court." (Citations omitted; internal quotation marks omitted.) *D'Ascanio* v. *Toyota Industries Corp.*, supra, 309 Conn. 671–72; see also *Evans* v. *General Motors Corp.*, supra, 277 Conn. 522–24; *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 15–16; *Pavlinko* v. *Yale-New Haven Hospital*, supra, 192 Conn. 145 (dismissal, when party fails to obey court's order, is appropriate and serves as penalty and deterrent).

To determine whether the court's dismissal of the plaintiff's case constituted an abuse of discretion, we must set forth a detailed account of the events that occurred each day of the trial. This account reveals that the plaintiff's confrontations with the court and his refusal to comply with its orders began on the first day

of the trial and continued to its end on the fifth day of trial.

FIRST DAY OF TRIAL—OCTOBER 27, 2015

At the outset of the first day, the court instructed that there were to be no "speaking objections" and that it would notify the parties regarding any further argument. The plaintiff inquired if a copy of the "Practice Book" could be made available for his use during the trial, and the court replied in the negative.[5] The plaintiff then asked if he would be permitted to testify from the counsel table, rather than the witness stand. The court replied in the negative. It reasoned that the jury would need an unobstructed view of the plaintiff as he testified and that "to maintain a proper decorum, each witness should testify from the witness chair." The plaintiff countered that it would be easier for the jury to see him at the counsel table and that, in unrelated cases, he had been permitted to testify from the counsel table to accommodate his status as a self-represented party. The court iterated its ruling that the plaintiff would testify from the witness stand.

After further discussions regarding the plaintiff's testimony, the court stated that he would not be permitted to read from a "marked up" copy of an exhibit. The plaintiff voiced his displeasure with this procedure.[6] The court responded that its role was to manage the case, and that if this method proved unwieldy, then a modification could be made. It also noted that the plaintiff could testify in a narrative, or use a question and answer format. The court instructed that he could use marked up copies of exhibits to present his case, but could read only from full exhibits. The plaintiff then asked if the court had any legal authority that required a witness to testify from the witness stand, but the court declined "to articulate" on that issue. The plaintiff opined that the court had imposed a hardship on him.[7]

After a recess, the court informed the jury that the trial likely would last through the middle of the following week. The plaintiff and the defendant's counsel made opening statements and then the evidentiary phase of the trial commenced.

The plaintiff was the first witness. During his testimony, the defendant's counsel made a hearsay objection. The court sustained the objection and explained to the plaintiff that an out-of-court statement offered in court to prove the truth of the matter, even if made by the plaintiff, constituted hearsay. The following colloquy occurred:

"[The Plaintiff]: This is the first I've heard of that. Exception.

"The Court: I'm sorry, Mr. Emerick.

"[The Plaintiff]: I will take an exception.

"The Court: The objection is sustained. Move on.

"[The Plaintiff]: I've never heard of this.

"The Court: Ask another question.

"[The Plaintiff]: I've never heard of this.

"The Court: Mr. Emerick, I'm going to ask you not to comment—

"[The Plaintiff]: Yes, Your Honor.

"The Court: —on the rulings of the court."

After a further comment by the plaintiff, the court reminded him that speaking objections were not permitted. The court then excused the jury and stated: "I just want to remind you that I specifically directed that there be no speaking objections. And it's not proper for you to challenge my rulings in a way; if it's based on the law, it's one thing, but if it's not your understanding, Mr. Emerick, you are not a lawyer; so I'm going to guess that there are other things that may be not your understanding. But just because it's not your understanding, that doesn't mean that it's admissible in evidence." A discussion on whether the plaintiff's out-of-court statements constituted hearsay ensued, with the plaintiff requesting that the court provide a citation to support its ruling. The court declined to do so, and instead suggested to the plaintiff what testimony would be admissible.

The court stated that it would not explain the rules of evidence to the plaintiff at the cost of the time of the jury. The plaintiff remarked that he was surprised by the ruling and that his concept of what testimony would be permitted had been "turned . . . on its head." The plaintiff also questioned why his complaint had not been stricken, and the court explained that the complaint contained allegations, while the rules of evidence applied to "things that are being offered into evidence in court."

The plaintiff's testimony continued, with the defendant's counsel raising numerous objections, many of which the court sustained.[8] The plaintiff eventually turned his testimony to conversations that he had had with an individual named Peter Stern. The defendant's counsel asked and received permission to raise an objection outside the presence of the jury. The defendant's counsel stated that this topic had been the subject of a motion in limine and that the court previously had informed the plaintiff that he was not permitted to discuss any conversations that he had had with Stern. A dispute between the plaintiff and the defendant's counsel ensued, at which point the plaintiff stated that the defendant's counsel "lies all the time."[9] The court instructed the plaintiff and the defendant's counsel to refrain from talking over each other and that argument would be conducted in an orderly fashion. After considering the matter, the court sustained the objection and the plaintiff's testimony resumed.

The plaintiff subsequently sought to have a document admitted into evidence and the defendant's counsel raised numerous objections, including a lack of authentication. After the court sustained the objection, the plaintiff requested an interruption of his testimony to "briefly" call Pennington, the engineer and manager of physical services for the defendant, to authenticate the document. The court rejected this, stating that it was "not appropriate" and that the plaintiff could not "have a witness testify in the middle of another witness' testimony." The court then excused the jury.

The court informed the plaintiff that he needed to "plan out" his evidence and testimony. The plaintiff responded that the court's interpretation of the authentication requirement was "bizarre." After a recess, the plaintiff again described the proceedings as "bizarre." Eventually, the jury returned and the plaintiff's testimony continued for the remainder of the day.

SECOND DAY OF TRIAL—OCTOBER 28, 2015

At the outset of the second day of trial, the defendant's counsel noted that several of the photographs that the plaintiff would be seeking to have admitted into evidence contained "editorial comments." The defendant's counsel wanted to raise her concerns about these exhibits outside the presence of the jury because she felt "like I'm being put in the position where I look like I'm harassing [the plaintiff] by objecting, because the jury doesn't understand what the [Connecticut] Code of Evidence is. I'm repeatedly objecting. It looks like I'm harassing him. It's prejudicial to the [defendant]." The court ruled that the objections would need to be raised in due course as the plaintiff attempted to introduce each of the photographs into evidence. The discussion then turned to another exhibit, and the court indicated to the plaintiff that this document contained hearsay. The plaintiff responded: "It is not hearsay. You're making this up." During the court's response, the plaintiff interrupted, prompting the following admonition: "Excuse me. I am talking, Mr. Emerick. I am talking. You may not like it, but my job here is to rule on the evidence that is offered in this case, in accordance with the Code of Evidence, not what you think it should be."

After further discussion, the court warned the plaintiff that several of his exhibits were "problematic" and subject to objections from the defendant's counsel, and therefore he should refrain from discussing the substance of these exhibits. The plaintiff claimed that all of the objections by the defendant's counsel had been sustained, and that "lawyers have a right to lie, and I'm getting tired of it." The court stated that while the plaintiff was entitled to his opinion, he was not to repeat his derogatory comments about lawyers to the jury.

The plaintiff resumed his testimony in front of the

jury. At one point, the court, after sustaining an objection, reminded the plaintiff that his out-of-court statements, offered for the truth of the matter asserted, constituted hearsay. Outside the presence of the jury, the court inquired as to how long the plaintiff's testimony would last; he replied, "[m]aybe all month. Excuse me. I tend to be jocular on occasion." The court repeated its inquiry, and a dispute ensued.[10] At this point, the plaintiff moved for a mistrial, which the court denied.[11] The court again cautioned the plaintiff about his conduct and raised the possibility of sanctions.[12] It then instructed the plaintiff to prepare a written outline of the remainder of his testimony during the lunch break. In response, the plaintiff again complained about the court's evidentiary ruling and included ad hominem remarks regarding Judge Peck's competence.[13]

The court restated its order for the plaintiff to compose an outline, and further argument ensued. During this argument, the plaintiff accused the court of giving "preferential treatment to lawyers" and was told, on several occasions, to stop speaking. The plaintiff characterized the court's statements as "ridiculous . . . ." Before the jury returned, the following colloquy occurred:

"[The Plaintiff]: This is not law.

"The Court: That's it.

"[The Plaintiff]: This is not law. *This is an abuse of law at the highest level.*

"The Court: I want—you will not say one more word. You will not say one more word. Get on that witness stand.

"[The Plaintiff]: I move to recuse.

"The Court: Mr. Emerick, take the witness stand. Sit down. And you will not make any further comments or raise your voice in front of this jury.

"[The Plaintiff]: *I have no respect for you whatsoever.*" (Emphasis added.)

The plaintiff resumed his testimony. Despite the court's prior rulings, he continuously made reference to photographs and documents that had been ruled inadmissible.[14] At one point, the court inquired if the plaintiff had planned to ask another question, to which he responded, "Yes, I am, unless you'd rather ask it for me." After a few more questions, the court informed the plaintiff that his testimony was not furthering the issues in this case and then excused the jury for lunch. The court reminded the plaintiff to complete his written outline for the remainder of his testimony during the break.

Before his testimony resumed, the court again warned the plaintiff about his conduct[15] and cautioned him to not raise his voice, even when the jury was

not in the courtroom. After an extended discussion regarding the admissibility of various exhibits, the following colloquy occurred:

"[The Plaintiff]: May I be excused and call me back when you and the lawyer here get done talking?

"The Court: No, sir. Exhibit 13.

"[The Plaintiff]: I again request a mistrial. A gross, gross, gross incompetence regarding legal knowledge and understanding what the complaint is about and literally fabricating things that don't make any sense at all. It's bizarre to me, what I'm listening to.

"The Court: I just want to note for the record, Mr. Emerick, that—well, first, it's appropriate to stand when you address the court. You don't have to respect me.

"[The Plaintiff]: I don't.

"The Court: Which you've already indicated on the record before, but you do have to respect the process.

"[The Plaintiff]: And you don't respect me or my complaint, and you're just using your position of power to formulate or promote the business of law, pursuant to Practice Book § 1-8.

"The Court: Your comments are totally inappropriate, Mr. Emerick.

"[The Plaintiff]: No, it's not.

"The Court: And I'm going to direct you to confine your comments to the legal issues that we have to address. These extraneous comments that you're making are totally inappropriate. Okay. Exhibit 13—

"[The Plaintiff]: And the comments that I'm hearing are totally inappropriate. . . . It's a waste of time."

As the parties and the court continued to discuss the exhibits outside of the presence of the jury, the plaintiff asked if he would be permitted to voir dire the defendant's counsel regarding her "math capability" and stated that the court was "just nodding your head like you're drugged or something. Yeah, let's move on. This makes no sense." After a ruling on a particular exhibit, the plaintiff sarcastically remarked, "[o]f course it's not coming in," and moved for a mistrial because it was "a waste of time presenting a case" to the court, which, in his view, was "incompetent." Shortly thereafter, after the court asked him about a particular exhibit, the plaintiff abruptly left the courtroom, without asking permission to do so.

After a recess, the court made the following statement outside the presence of the jury: "Mr. Emerick, you've been extremely disrespectful of this process, the court, opposing counsel. You've shouted at me. You have talked over me. You've made snide and insulting comments to me, demonstrating what you have stated

to be your lack of respect for me. *Your behavior is intolerable*, but I want to put you on notice now that you will not comment. I am going to rule on evidence. You will not comment on my rulings. *You will not be disrespectful to me or opposing counsel or I will dismiss your case.* I want you to understand that.

"I will not declare a mistrial. *I will dismiss your case.* You do not have to like me. I'm not asking you to. But you have to respect this process, or you have no right to be here. You can disagree but you cannot be—you cannot continue to be abusive. Your behavior has been abusive. *You must present your case in a proper and respectful manner, in accordance with the rules of decorum and the rules of practice and the rules of evidence of this court, or it will be dismissed.*

"I want you to understand that. This is the—I should have warned you when we came back from lunch, and I deferred, because I thought maybe we could make some headway. But it's obvious to me after that scene that you just created by rudely turning your back, rushing out of the courtroom, slamming the swinging door against the wall, that you need to know and understand that this is the way it's going to be.

"So, what I'd like to do now, if you will agree with what I just said, that you understand what I've just told you, Mr. Emerick, we can proceed. . . . *But if you have no intention of behaving in a proper and civilized and nonabusive manner, then I think the sanction of dismissal is an appropriate one.* Do you understand?" (Emphasis added.) The plaintiff responded in the affirmative. Despite the court's statement, the plaintiff again challenged the honesty of the defendant's counsel specifically, and attorneys generally. Later that day, and outside the presence of the jury, the plaintiff raised his voice to the court, and after an objection was sustained, he remarked, "[n]o kidding."

THIRD DAY OF TRIAL—OCTOBER 30, 2015

On the third day of trial, the court commented on the plaintiff's conduct. "I just have a few remarks I want to make before we begin. They're directed against the— primarily concerning the disruptive behavior of [the plaintiff] on [October 29, 2015], which needs to be addressed by the court. And I just want to say to you, Mr. Emerick, I know I may have said some of this previously, but it bears repeating.

"Because you've chosen to represent yourself, it does not mean that you get to rewrite the rules of court to suit yourself. You are not an inexperienced litigant. This is not the first time that you have represented yourself in a civil proceeding. Your behavior thus far has been extremely disruptive and calculated in an effort to present your case in the peculiar way that you believe you should be entitled to present it, despite warnings that your tactics are improper and unacceptable in a court

of law.

"This court, the Superior Court, has existed—existed long before you filed your first pleading in this case. It will continue long after this lawsuit is history. Individual litigants do not come here on a blank slate, and you know this, based on your own courtroom experiences. There are rules of courtroom decorum, rules of civil practice, and rules of evidence established by our legislature and judges of the courts of this state that must be followed in fairness and justice to all parties to a litigation, the jury and the public.

"You can't ignore the rules based on your own vision of how you should be able to present your case to a jury. Now, my goal is to conclude this trial on the merits, and I make this statement at this point to remark for the record that your behavior has been an outrageous display, disrespectful of opposing counsel, her client, and the jury, and the court, as I have noted. It has delayed the progress of this trial, caused the jury to be excluded from the courtroom for extended periods of time to go over, while we go over in court, issues relating to your exhibits, all of which could have been avoided, had you heeded the directions and rulings of the court.

"You'll recall that the court first attempted to resolve issues relating to your exhibits on Monday, before the evidence began; despite several efforts, you have chosen to ignore the concerns and proper objections to your proposed exhibits at a time when much of the delay could have been avoided. You've also ignored rulings and directions of the court concerning the rules of evidence and the rules of practice concerning your exhibits and testimony. You've flagrantly violated proper courtroom decorum by making personal attacks against opposing counsel and me.

"You rudely speak while others are speaking; you continuously interrupt. You have shouted at me in an extremely loud voice and in disparaging tones. You stormed out of the courtroom on Wednesday [October 28, 2015] in the midst of being addressed by the court. You slammed the swinging door against the wall upon exiting so loudly that the marshals were alerted. You have repeatedly ignored the rulings of the court, causing them to be repeated over and over, all resulting in unnecessarily delaying these proceedings.

"*This repeated behavior is contumacious.* It cannot go unaddressed, as I've indicated. You've acted in a wilful—in a wilful, repeated, conduct which is directed against the dignity and authority of this court, which has interfered with the orderly administration of justice. If you repeat this conduct, I will fine you for each such contemptuous act. Do you understand what I've just said to you, Mr. Emerick? [The plaintiff responded in the affirmative.] Okay. All right. Then, let's begin. Hopefully, today's a new day." (Emphasis added.)

The parties and the court resumed discussions regarding exhibits that the plaintiff would be attempting to introduce into evidence. On two occasions, the court warned the plaintiff that the next time he spoke when the court was talking, it would "cost [him] a hundred dollars . . . ." The court extensively explained the redactions needed so that certain exhibits would be admitted into evidence. It also informed the plaintiff that his testimony needed to be concluded by the lunch break.

The plaintiff again requested a mistrial, which the court denied.[16] The court directed the plaintiff to take the witness stand, and the plaintiff continued to complain about the court's rulings. After being directed to the witness stand for a second time, the plaintiff responded: "Incredible." The court imposed a $100 fine for his "gratuitous comment . . . ."[17]

During his testimony, the plaintiff repeatedly was cautioned not to refer to items that had been ruled inadmissible.[18] After the court excused the jury for the morning recess, it articulated its concern regarding the length of time to complete both the plaintiff's testimony and the trial. During this exchange, the plaintiff questioned the court's impartiality and stated, "I notice you read the statement this morning. Did you get that yesterday with all the judges and your help?" The court responded: "I'm going to warn you again, Mr. Emerick, you make another comment like that and I will fine you another hundred dollars. It's impertinent. It has nothing to do with your case. It's totally improper. You will show proper respect and decorum in this courtroom."

Following the morning recess, the plaintiff's testimony continued. He raised the issue of whether the complaint had contained "a claim for emotional distress . . . ." The defendant's counsel immediately objected, and the court excused the jury. The defendant's counsel argued that the plaintiff was ignoring the court's previous rulings.[19] The court agreed with counsel's argument.

The plaintiff completed his testimony, and the defendant's counsel conducted her cross-examination. During the plaintiff's redirect examination, he made reference to an offer of settlement. The court sustained the immediate objection from the defendant's counsel and struck the plaintiff's statement. Shortly thereafter, he made another reference to an offer to settle the matter, prompting another objection.[20] After a third reference to settlement discussions, the court excused the jury. The defendant's counsel argued that the plaintiff had abandoned his action by wilfully ignoring the court's instructions and requested a dismissal.[21] During the ensuing argument, the plaintiff claimed that the defendant's counsel stated an "outright lie . . . ." The court admonished the plaintiff for that accusation and for speaking over the court.[22]

The plaintiff completed his redirect examination and called Pennington as the next witness. After the jury had been excused for the day, the defendant's counsel informed the court that she planned to move for a directed verdict at the conclusion of the plaintiff's case. The court then adjourned for the day.

FOURTH DAY OF TRIAL—NOVEMBER 3, 2015

On the next day of trial, the court immediately inquired about the time frame for concluding the case. The impetus for this discussion was a note from an alternate juror asking to be excused because of a financial hardship. The court noted that the jurors had been informed that the trial would take four days, and yet, at the start of the fourth day of evidence, the conclusion of the trial was not imminent. The plaintiff estimated that he could complete his direct examination of Pennington by the end of the day. The court responded: "Oh, no, no, no. Not today. You have to finish him this morning. There's no question about it. No question. You can't have beyond this morning with this witness."

The court then addressed and orally denied the plaintiff's written motion for a mistrial alleging judicial bias.[23] Pennington's testimony resumed, subject to a variety of successful objections from the defendant's counsel. At one point, the court excused the jury and rejected the plaintiff's attempt to have certain exhibits admitted into evidence as a judicial admission. Later, the following colloquy ensued:

"The Court: . . . This case has been unduly prolonged because the plaintiff, in particular, has repeatedly sought to introduce things and argue evidentiary issues over and over and over again, despite the rulings of this court.

"[The Plaintiff]: And my reply—

"The Court: We need to—we need to move on, Mr. Emerick.

"[The Plaintiff]: I agree.

"The Court: The jury, you know, one of my roles as a judge is to, you know, protect the integrity of the administration of justice. You know, a jury's time and attention has to be protected. It's not protected, it's not respected, if their time is wasted sitting in a jury room because issues that have been addressed and ruled on by the court and that you have made a redundant record of, you keep on raising it and raising and raising. It's disrespectful of the jury. It's disrespectful of this process, and we need to move this case along."

After the lunch break, the defendant's counsel argued that Gadwa was not qualified to testify as an expert and that, in the alternative, her opinions would not assist the jury in understanding the evidence in this case. The court excused the jury for the remainder of

the day. During his voir dire of Gadwa, the plaintiff claimed that the court had interrupted him, and the court iterated that the trial had gone on "way too long" as a result of "unnecessary arguments and improper arguments" by the plaintiff. The plaintiff responded, "[i]ncredible, incredible." The court warned him that if he made a similar comment again, he would be fined.

Later, the plaintiff asked Gadwa whether the defendant had acted negligently or recklessly. The defendant's counsel objected, arguing that the court previously had ruled that topic improper because it went to the ultimate issue for the jury. The court agreed with the defendant's counsel. The plaintiff responded: "Let the record show that I filed an exception on this. This is beyond, again, beyond belief, beyond credibility, beyond the generally accepted common knowledge of the general public, beyond anything I've read in law thus far. This goes well beyond anything. This is—appears to be, and I cite this as an objection—this is so gross; this is like a collusion between the judge . . . and the defendant's counsel." He also noted that he could not understand the court's confusing and bizarre statements.

After more questions to Gadwa, the court sustained an objection, and the following colloquy occurred:

"[The Plaintiff]: Can the court please tell me what I plead[ed] in my complaint, because this is what we're talking about. This is my complaint; so can you tell me, please—

"The Court: Ask another—

"[The plaintiff] —do you have enough decency to let—

"The Court: You know what, we're going to adjourn for the day.

"[The Plaintiff]: —me speak, and please have enough decency to tell me what my complaint is about?

"The Court: Mr. Emerick, you are totally out of line. You are totally out of order.

"[The Plaintiff]: You cut me off every time I start to speak.

"The Court: It is not the role of the court to tell you how to conduct your examination.

"[The Plaintiff]: Do you understand when I file a motion for mistrial—

"The Court: I've tried to—

"[The Plaintiff]: —I went downstairs and vomited [during the second day of trial after he abruptly left the courtroom] because I realized what you were doing. That's how sick you got me. I'm standing in front of someone—

"The Court: Mr. Emerick—

"[The Plaintiff]: —after all this time, that I know is here to destroy my case—

"The Court: Mr. Emerick—

"[The Plaintiff]: —with their logic.

"The Court: —that's going to cost you another hundred dollars. You're up to three hundred dollars. You're totally out of order. You have disrespected this court; you have abused—you have abused—

"[The Plaintiff]: I disagree.

"The Court: —the privilege that you're being given here.

"[The Plaintiff]: Self-serving. I swore I would not get mad today. I swore I would not raise my voice.

"The Court: You are—you have constantly—

"[The Plaintiff]: And you are always able to do it.

"The Court: You are rude, you are abusive. You are abusing this process. You have squandered your time, squandered the time of this jury. You are totally out of line."

The court then adjourned for the day.

FIFTH DAY OF TRIAL—NOVEMBER 4, 2015

On the final day of the trial, the court informed the parties that it would permit Gadwa to testify and that the defendant's counsel would have to raise her objections in front of the jury. After the court sustained an objection raised by the defendant's counsel, the plaintiff remarked, "[i]ncredible." The court instructed the plaintiff to refrain from commenting on its rulings. After an objection was raised following the plaintiff's next question to Gadwa, the plaintiff spoke over the court as it ruled. The court admonished the plaintiff: "Mr. Emerick, you are out of line. You will not speak when anybody else is speaking. You will not be disrespectful to the court." It then offered the plaintiff some suggestions on how to question his expert.[24] Rather than follow the court's advice, the plaintiff commented on the court's statement and was ordered to refrain from such behavior.

The plaintiff attempted to introduce a document, exhibit 13, into evidence, which the court previously had ruled inadmissible on several occasions. The court excused the jury, and the defendant's counsel stated: "I know that the court is making its best effort to make this a fair and balanced proceeding, but when you rule and tell [the plaintiff] to move on and that this is not admissible, and he keeps going back and he keeps going back, the jury necessarily wants to see that [exhibit 13]. It's highly prejudicial to my client. He's not following this court's instructions." The court noted its agreement

with the defendant's counsel, who requested that the plaintiff's case should be considered abandoned and dismissed, or, at a minimum, that the plaintiff follow the court's instructions. The court responded: "I don't disagree with you. Your behavior, Mr. Emerick, is obstructive to the progress of this case." The plaintiff continued, and the court admonished the plaintiff from arguing in that "tone of voice. . . . You will not, Mr. Emerick, or I will remove you—have the marshal remove you from this courtroom. . . . I'm sorry. We are not going to keep doing this, Mr. Emerick. You will adhere to the rules of this court, period. If you do not, I will dismiss this case. We've not made any progress, hardly no progress with this witness, because of your obstreperous behavior, your refusal to accept the rulings of this court. In this courtroom, it is the judge, the person in this chair, where I am, who makes rulings on the law. You don't have to agree with me. I don't require you to agree with me. I just require you to accept my rulings, and if, at the end of this case, the case goes against you, you can take it up with an appellate court, as is your right to do. But for now, for here, I am the final say on what the law is. Do you understand me? I know you're not looking at me. You're looking down and you're reading something, and I don't know what you're doing. As you've repeatedly done, you refuse to look at the person who's speaking to you. So, do you understand and hear me, what I've said? In this courtroom, I am the final arbiter of what the law is. Do you understand?" The plaintiff responded in the affirmative. Before taking a recess, the court informed the plaintiff that it would not revisit this evidentiary ruling.

After the ruling, the plaintiff resumed his questioning of Gadwa. Shortly thereafter, he made reference to exhibit 13, prompting an objection from the defendant's counsel, which the court sustained.[25] The plaintiff then posed a series of questions to Gadwa, many of which were successfully objected to. The defendant's counsel specifically requested that the court order the plaintiff to cease questioning Gadwa with respect to exhibits 17, 18, and 23. The court instructed the plaintiff to refrain from discussing those exhibits, and he responded by citing to § 7-4 of the Connecticut Code of Evidence. The court declined to entertain this argument and instructed him to proceed. The court again attempted to guide the plaintiff in the questioning of an expert witness.

After some further questioning, the court sustained an objection by the defendant's counsel to a portion of Gadwa's testimony that was based on speculation. The court instructed the jury that Gadwa's response was speculation and therefore could not be considered in its deliberations. The plaintiff then questioned Gadwa regarding a photograph of water that was not on the plaintiff's property, which the court previously had ruled inadmissible. The court sustained the objection

by the defendant's counsel, explaining to the jury that opinions regarding other property were not relevant to the plaintiff's case. The plaintiff then asked if Gadwa had an opinion about the "source of some of the water quality" on his property. The defendant's counsel objected, and the court again excused the jury.

The court heard argument from the defendant's counsel and the plaintiff. The court noted that evidence was needed to support the allegations contained in the complaint, at which point the plaintiff interrupted the court. The plaintiff accused the court of "redrafting" his complaint and always interrupting him. After allowing further argument from the plaintiff, the court sustained the objection by the defendant's counsel. The plaintiff then stated: "I would like to just first move for a mistrial because you are so bizarre in your statements. It is bizarre beyond anything I've ever come across in my life, what you're saying. It's bizarre. I don't know how to address something which is—it doesn't register on a general public scale of common intelligence that you would expect someone to—to say. What you're saying makes no sense at all, actually, no sense. It's contrary to the complaint. It's contrary to the evidence that's been entered. It's contrary to everything for validation; there's nobody would say that this is not valid. . . . And you just keep talking in circles like this lawyer here about some—nothing is relevant. There is nothing relevant. The whole complaint is about what they've done to allow this quality and quantity degradation coming in."

The plaintiff then criticized the court's ruling as making "no sense at all, none, in law and the rules of the Code of Evidence . . . ." At this conclusion of his commentary, the following colloquy occurred:

"The Court: Mr. Emerick, you have been grossly insulting. You've abused me, you've insulted me. You have abused—you have abused this process in a way that has totally disrupted and interfered with the administration of justice—

"[The Plaintiff]: I consider that a lie.

"The Court: —as I have always understood it to be. And I—you have insulted me openly. You have insulted me repeatedly under your breath. You've accused me now, for at least the third time, of making bizarre rulings. You have accused me of trying to destroy your case. You have only—you only have listened to what you have to say and what your view of this case is. That is just—if you have—just give me a moment. You obviously have no respect for court rules or procedure. You have no respect for the rule of law other than your own interpretation as what that should be. Your behavior is unmanageable. If I haven't said it's intolerable, you know, I'll say it again. You have insulted your opposing counsel repeatedly, repeatedly. You've made

everybody in this courtroom uncomfortable. You have wilfully disregarded any semblance of courtroom decorum. If I didn't indicate it before, you verbally abused staff.[26]

"[The Plaintiff]: I will note that the court is reading from a preprepared statement before any of this occurred.

"The Court: Absolutely, because I have thought—

"[The Plaintiff]: She had prepared it before she even walked into court and brought it with her. So, now she was reading it—

"The Court: I hope that I—

"[The Plaintiff]: —so that she can justify—

"The Court: —any statement that I make, Mr. Emerick, is only because it's thoughtful, that I have given it a great deal of thought.

"[The Plaintiff]: Planning, is what I call it.

"The Court: And I have—I think I've been very restrained. I indicated to you last Wednesday, the second day of trial, because of your behavior on that day, that as a sanction, that your case should be dismissed, because you really do not—you don't respect the process. And to the extent that you are not willing to abide by the established rules of practice and procedure and evidence and rules of decorum, you really have abused your right to be here. You—

"[The Plaintiff]: This is all preplanned on your part. You know that as well as I do, and you want to put that down on the record—

"The Court: This is not helping you. This is not helping you one bit.

"[The Plaintiff]: —so the Appellate Court can say, oh, we have to stand by our colleague in the business.

"The Court: This is not helping you one bit, Mr. Emerick.

"[The Plaintiff]: A hundred percent of the objections by opposing counsel, which are bizarre, one hundred percent are sustained, no matter what they are.

"The Court: You know—

"[The Plaintiff]: It gets old.

"The Court: —Mr. Emerick, after this case, you know, this process, civil justice, civil trials, it will continue on, you know, after both you and I are gone. It's bigger than you, it's bigger than me.

"[The Plaintiff]: Right. And people standing before you will be in the business, and so they have to accommodate that. That's right.

"The Court: And—

"[The Plaintiff]: People in the business will accommodate them.

"The Court: —my concern at this point is preserving the integrity of the judicial process.

"[The Plaintiff]: No, it isn't at all. That's why you're smiling so much. Let it be shown that the court is smiling with a preprepared statement that she made before she even walked into court, and then she knew she would ask questions and make ruling, so that—to make me look bad. It's so obvious; it's not very intelligent.

"The Court: You have repeatedly—

"[The Plaintiff]: It's well planned out. And you can smile because you know the Appellate Court will do nothing but—

"The Court: If you continue, Mr. Emerick—

"[The Plaintiff]: —agree with you on everything. All you have to do is read the statement.

"The Court: —if you don't stop talking, I'm going to ask the marshal to take you outside, and when you're prepared to listen, I'll have him bring you back. But you need to stop talking, because I have a right to speak, too. You've refused to follow or respect the requirements of the law as articulated by this court, and like I indicated to you just earlier today, in this courtroom, it is my job, whether, you know, you like it or not, it is my job to decide what the law is and what the appropriate procedure is for us to follow. We don't all—we don't—the litigants that come to this court do not create their own rules. We can't operate that way; we don't operate that way. It has no place here, you divining your own rules and your own interpretation of the law . . . ."

The court and the plaintiff then discussed the issue of what opinion testimony would be permitted from Gadwa. After debating what had been said on the prior day regarding § 7-3 of the Connecticut Code of Evidence, the court stated: "I don't know where you came to the—jumped to the conclusion that you jumped to, Mr. Emerick, but that's your problem. That's not mine, because that is not what I—I never told you yesterday that you could not elicit opinions from your expert witness. We're finished here, Mr. Emerick. I'm dismissing your case." In conclusion, the plaintiff stated that he had "spent five years or four years on a case, present a perfect case, and you destroyed it because I'm a self-represented party. Congratulations, [the defendant's counsel], corruption prevails."

As we have detailed extensively, the plaintiff inappropriately challenged the court's rulings from the outset of the trial through the order of dismissal. He also consistently interrupted and spoke over the court, despite numerous warnings about this behavior. The plaintiff

refused to accept the court's evidentiary rulings. Over the course of the trial, he insulted the court by calling the rulings "bizarre" and remarking that the trial court was "incompetent" and needed "to go back to law school." The plaintiff also accused the court of speaking in "gibberish" and nodding her head as if "drugged . . . ." He made unsubstantiated allegations of "gross incompetence" and a "collusion" between the court and the defendant's counsel. Our review of the audio recording of the trial proceedings revealed several instances where the plaintiff also made gratuitous remarks, sarcastic grunts and audible sighs in response to the court's rulings.

During the trial, the court explained that its role was to manage the proceedings and expressly remarked that its goal was to conclude the case on the merits. The court noted its willingness to modify the manner in which the plaintiff testified, if necessary, offered suggestions on how to question witnesses and present evidence so that it could be admitted, and provided the plaintiff with detailed explanations of its evidentiary rulings. The court, however, did caution that it could not take the time to educate the plaintiff on our rules of evidence at the expense of the jury's time. At one point, in an apparent effort to move the trial along, it ordered the plaintiff to create an outline of his testimony.

The court also employed a series of progressive steps in an effort to address the plaintiff's untoward behavior. It started with verbal warnings and reminders to avoid "speaking objections." It continually instructed the plaintiff to cease commenting on evidentiary rulings, interrupting the court and making insulting or disparaging remarks. On the second day of trial, the court advised the plaintiff that he could face sanctions, including dismissal, if this behavior continued. It stated that the plaintiff would be fined if he continued with his refusal to comply with the court's orders. After several warnings, the court fined the plaintiff on the third and fourth days of the trial for his refusal to follow its instructions and his persistence in commenting on its evidentiary rulings. The court advised the plaintiff on multiple occasions that dismissal of the case was an option it would consider if he continued with his actions.

We iterate that the sanction of dismissal does not constitute an abuse of discretion "where a party shows a deliberate, contumacious or unwarranted disregard for the court's authority . . . ." (Internal quotation marks omitted.) *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 16–17; *Fox* v. *First Bank*, supra, 198 Conn. 39. The plaintiff's conduct, considered in its entirety, satisfied this standard. The plaintiff did not demonstrate any mitigating factors for his actions during the trial. Cf. *Usowski* v. *Jacobson*, 267

Conn. 73, 93–95, 836 A.2d 1167 (2003) (in each instance where plaintiff failed to comply with order of court, mitigating factor was present, and thus conduct did not evince contumacious or unwarranted disregard for court's authority and there was not a pattern of abuse so egregious as to warrant dismissal). Additionally, the court's use of a series of escalating disciplinary steps to compel the observance of its orders proved unsuccessful, leaving dismissal as a last resort, and therefore the only reasonable remedy. The court's repeated warnings, suggestions and fines had no impact on the plaintiff, as he ignored the court's admonitions and continued to delay the trial. See *Pavlinko* v. *Yale-New Haven Hospital*, supra, 192 Conn. 144–45 (dismissal was only viable sanction where plaintiff administrator of estate removed hospital records of his decedent and refused to answer questions about integrity and reliability of those records in medical malpractice action); see also *Fox* v. *First Bank*, supra, 40 (court afforded plaintiff several chances to comply with payment orders before dismissing her case); cf. *D'Ascanio* v. *Toyota Industries Corp.*, supra, 309 Conn. 683–84 (after dishonest conduct of plaintiff's expert, court could have struck his testimony or granted request for continuance or mistrial rather than dismiss the case). Simply put, the plaintiff's continuing and deliberate misconduct, for which he bears sole responsibility, demonstrated such deliberate disregard for the court's orders as to warrant dismissal. See *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 14; cf. *D'Ascanio* v. *Toyota Industries Corp.*, supra, 679–82 (dismissal of case constituted abuse of discretion where plaintiffs were not complicit in dishonest and deceitful conduct of expert witness, objectionable conduct was isolated event and not a series of actions done in disregard of court's authority and plaintiff was not given opportunity to rectify situation). We conclude, therefore, that the court did not abuse its discretion in dismissing the plaintiff's case.

We now briefly address the remainder of the claims raised by the plaintiff in this appeal. First, he claims that the court erred in dismissing the case by not adhering to stare decisis standards. Specifically, the plaintiff quoted language from *D'Ascanio* v. *Toyota Industries Corp.*, supra, 309 Conn. 670–72, arguing that the court did not follow the controlling authority from our Supreme Court. We are not persuaded by these arguments, many of which we have addressed in this opinion, and conclude that the court's dismissal did not conflict with the *D'Ascanio* case.[27] Accordingly, the plaintiff's claim regarding stare decisis is without merit.

Next, the plaintiff claims that the court erred in dismissing the case on the basis of arguments set forth in his motion to reargue and his motions for a mistrial, which alleged judicial bias.[28] In the motion for reargument, the plaintiff assumed that the dismissal followed from a finding of contempt pursuant to General Statutes

§§ 51-33 and 51-33a, and Practice Book § 1-14. This assumption, however, is incorrect. The dismissal was based on the court's inherent authority to compel observance of its rules and to deal with continuing misconduct. The plaintiff's contempt arguments, therefore, are inapplicable to the present case, and therefore are without merit.

The plaintiff also relied on the Code of Judicial Conduct and made allegations regarding the court's unwillingness to recuse itself or grant a mistrial. After a careful review of these arguments, we conclude that they are wholly without merit. First, we disagree with the plaintiff's blanket assertion that the court failed to consider his motions for recusal and for a mistrial. Second, we also are not persuaded that the court improperly failed to grant his repeated requests for a different trial judge. The mere fact that the court ruled adversely to the plaintiff does not equate to a showing or appearance of bias necessitating recusal. "[A]dverse rulings do not themselves constitute evidence of bias. . . . Obviously, if a ruling against a party could be used as an indicia of bias, at least half of the time, every court would be guilty of being biased against one of two parties. Moreover, the fact that a trial court rules adversely to a litigant, even if some of these rulings were determined on appeal to have been erroneous, [still] does not demonstrate personal bias. . . . The fact that the plaintiff strongly disagrees with the substance of the court's rulings does not make those rulings evidence of bias. In the present case, the plaintiff's argument of bias is completely unsubstantiated by the trial record." (Citation omitted; internal quotation marks omitted.) *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 317, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010); see also *Tracey* v. *Tracey*, 97 Conn. App. 278, 284–85, 903 A.2d 679 (2006) (in addition to adverse rulings, vague and unverified assertions of opinion, speculation and conjecture cannot support claim of judicial bias).

The plaintiff next argues that the court's dismissal was improper because there was no misconduct that occurred in the presence of the jury. Although much of the continuing misconduct that resulted in the dismissal occurred outside of the presence of the jury, there were instances where the plaintiff raised his voice or challenged the court's evidentiary rulings in front of the jury. Nevertheless, the absence of the jury when certain acts of misconduct occurred did not deprive the court of its authority to sanction the plaintiff for his continuing misconduct during the trial and lack of cooperation with the court. See generally *State* v. *Jones*, 281 Conn. 613, 625–37, 916 A.2d 17 (defendant, outside presence of jury, argued with court and during his removal from court engaged in physical altercation with marshals and this conduct constituted waiver of right to be present at trial), cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169

L. Ed. 2d 112 (2007); see also *Pavlinko* v. *Yale-New Haven Hospital*, supra, 192 Conn. 145.

Finally, the plaintiff claims that the dismissal violated his right to procedural due process and cites to article first, §§ 10[29] and 19,[30] of our state constitution. This portion of the plaintiff's appellate brief essentially restates his previous arguments, which we previously have rejected, and fails to adequately brief his constitutional claim. See, e.g., *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] As stated in the table of contents in his appellate brief, the plaintiff set forth the following issues: "(1) Did the Court err in dismissing the case during trial based on [November 4, 2015] statements? (2) Did the Court err in Dismissing the Case based on stare decisis standards? (3) Did the Court err in Dismissing the Case based on Rules and Laws as argued in Reargument and Motions for Mistrial? (4) Did the Court violate plaintiff's . . . rights to due process in dismissing the case?"

[2] General Statutes § 13a-138 provides: "(a) Persons authorized to construct or to repair highways may make or clear any watercourse or place for draining off the water therefrom into or through any person's land so far as necessary to drain off such water and, when it is necessary to make any drain upon or through any person's land for the purpose named in this section, it shall be done in such way as to do the least damage to such land.

"(b) Nothing in this section shall be so construed as to allow the drainage of water from such highways into, upon, through or under the yard of any dwelling house, or into or upon yards and enclosures used exclusively for the storage and sale of goods and merchandise." See generally *Glasson* v. *Portland*, 6 Conn. App. 229, 234–35, 504 A.2d 550 (1986).

[3] In its memorandum of decision addressing the parties' motions for summary judgment, the court explained that the plaintiff's claim of breach of fiduciary duty incorporated the allegations set forth in count one and further alleged that the defendant had failed to return property to the plaintiff's grandfather after it was no longer used as a public school. The plaintiff claimed that this failure, which occurred in 1945, constituted a breach of fiduciary duty.

[4] At oral argument before this court, both parties expressly agreed that the court should listen to the audio recordings of the trial. Therefore, in addition to reviewing the transcripts, we also have listened to portions of these recordings.

[5] Specifically, the court stated: "Mr. Emerick, I'm sorry. I just don't think that's possible because these courtrooms are used all day long at various times, by different judges or magistrates who may rely on the Practice Book. The Practice Book has to be present in court within the courtroom, so—certainly, the library, I believe the library is open. You're welcome to go down during recess and check what you may need in the library."

[6] Specifically, the plaintiff stated: "[D]o you have any case law for that, because that's bizarre. I have marked my exhibits, where I want to read from, and you're telling me that I can't use that. I have to go by an unmarked copy and somehow flip through four or five hundred pages and find the spot, without looking to see where it is here, because—or I can run down, see where it is here, then run back and then look at it. We're making this way more complicated, and it's not toward the ends of justice whatsoever. It's making it mind-boggling confusion and unnecessary movement when it could be done so quickly otherwise. . . . We're making this way too complicated . . . ."

[7] Specifically, the plaintiff stated: "But I will note that typically, the counsel, when a party is represented by a lawyer, they typically have the advantage of being able to sit at their table and organize everything, and I won't be able to do that, presenting my case from the witness stand, especially if I ask myself questions, without being able to look at everything first and then ask a question. I just—I note there is—you're imposing a hardship on a self-represented party representing themselves that a represented party doesn't have."

[8] Both during the trial and on appeal to this court, the plaintiff suggested

that the court had sustained the majority of the objections raised by the defendant's counsel and that these rulings support his claims of judicial bias in favor of parties represented by counsel, and against self-represented parties, as well as bias against him personally. The number of the objections by the defendant's counsel that were sustained by the court, without more direct and substantive evidence of bias, is not a recognized way to demonstrate judicial bias. See, e.g., *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 317, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). Additionally, the plaintiff's conduct in revisiting matters that had been ruled on previously by the court resulted in many of the objections by the defendant's counsel that the court again sustained. For example, on October 28, 2015, the court iterated that photographs containing hearsay captions and descriptions would not be admitted into evidence. It further stated that the plaintiff had failed to offer "clean" copies of the photographs and, as a result, would "have to accept the consequences." Finally, it noted: "If you persist in offering this exhibit with various arrows and commentaries, and without establishing a proper foundation for the admission of each photograph . . . then the exhibit will be rejected."

[9] Later that day, and outside of the presence of the jury, the plaintiff again accused the defendant's counsel of lying.

[10] The following colloquy occurred:

"The Court: I want you to answer the question I just asked you.

"[The Plaintiff]: Could you please repeat it.

"The Court: I asked you how long you plan to testify.

"[The Plaintiff]: Well, I conversed and gotten opinions from probably half a dozen very high lawyers. I cannot give their names, or they will never help me.

"The Court: Mr. Emerick, I'm not interested—

"[The Plaintiff]: And the ability to submit a document—

"The Court: I'm not interested.

"[The Plaintiff]: I'm not done talking. The ability to submit a document that I created to the [defendant] and gave them is well within my right.

"The Court: Mr. Emerick, Mr. Emerick, you will not shout at me. You will not disrespect opposing counsel. You will not keep doing that.

"[The Plaintiff]: You interrupt me all the time.

"The Court: That is my privilege, to interrupt you. When you become the judge, then you can interrupt. But in the meantime, you're not the judge. And either we maintain proper decorum in this courtroom or you're going to have other problems. It is your choice. You could have retained any number of lawyers that you may have conferred with concerning this case. And until or unless you do, I have no interest in hearing anything about what any other person, what any lawyer has to say on your behalf."

[11] As the basis of his motion for a mistrial, the plaintiff alleged that he could not rely on the court's competency or impartiality.

[12] The following colloquy occurred between the court and the plaintiff:

"The Court: You will not talk when I'm talking, Mr. Emerick. You will not talk when I'm talking. You will not accuse me of things. You will not accuse me of things.

"[The Plaintiff]: I've asked—I'm raising a—

"The Court: I am sworn to uphold the laws—

"[The Plaintiff]: I don't believe it.

"The Court: —and constitution of the state of Connecticut and United States constitution. You will not accuse me of disrespecting the law. And in the course of doing that, that is my job. That is not what I'm charged with. I'm charged with making findings concerning the legal issues in this case, including evidentiary rules. If you don't like them, and this case turns out adversely to you, then you can pursue whatever remedies that you may have available to you. But in the meantime, we're going to do things in a proper way.

"[The Plaintiff]: That's your opinion.

"The Court: In this courtroom—

"[The Plaintiff]: Like I said, the attorneys I talked to state it's no problem at all submitting a document that you gave to the [defendant].

"The Court: —Mr. Emerick, that is the only opinion that counts. Don't push me, Mr. Emerick.

"[The Plaintiff]: I would like to recall the statement that I made previously, that when I first heard you were going to be on the case, I asked for a different judge—

"The Court: Mr. Emerick—

"[The Plaintiff]: —because I feel that you're—

"The Court: Mr. Emerick, it's just not possible. It's just not possible. So, either you do things the way you're supposed to do—

"[The Plaintiff]: I am.

"The Court: —get your case done, and you respect this jury and you respect this process or we're going to have a very rough road here.

"[The Plaintiff]: The attorney is getting away with misconduct.

"The Court: That is not true.

"[The Plaintiff]: Oh, it is.

"The Court: Because an attorney is representing or seeking to represent a client, you don't like it, that, you know—this is an adversarial process, Mr. Emerick.

"[The Plaintiff]: I know how to lay a foundation.

"The Court: You don't have to like it.

"[The Plaintiff]: I was going into laying a foundation.

"The Court: It's not—she's not here to please you and do things the way you want her to do them. She's here to represent a client. She has a professional responsibility to her client and she had, as an officer of the court, she has a responsibility to the court. So, until or unless you have something definitive to say, you will not say it again. You will not accuse opposing counsel of lying. If you do it again, then I'm going to have seriously consider sanctioning you."

[13] The following colloquy occurred between the court and the plaintiff:

"[The Plaintiff]: I asked to be allowed to put into evidence things that anybody could put into evidence, except in front of you in this court by a self-represented party. A document given to everybody that they have, and I'm not allowed to put it into evidence? *You need to go back to law school.*

"The Court: Mr. Emerick, being a self-represented party does not give you a license to violate the rules of appropriate—

"[The Plaintiff]: I do not.

"The Court: —decorum in the courtroom. It does not give you a license for the court to ignore the rules of evidence in your favor, and other rules of civil procedure.

"[The Plaintiff]: *You talk in gibberish half the time.*

"The Court: It does not give you a license, sir.

"[The Plaintiff]: *I listen to you talk and it's like gibberish I'm hearing, literally gibberish,* and I've also gotten that opinion from other attorneys as well, but I can't say their names." (Emphasis added.)

[14] The plaintiff's persistent behavior caused to the court to provide the jury with a general explanation as to why these photographs were not admissible evidence and to instruct the plaintiff to cease this line of testimony.

[15] The court stated: "And I just want to say to you, Mr. Emerick, that the fact that you are self-represented does not give you license to be disrespectful to the court or to opposing counsel."

[16] Specifically, the following colloquy occurred:

"[The Plaintiff]: I would like to—one more time, [make] a motion for mistrial. I think this is so grossly bias—

"The Court: Denied.

"[The Plaintiff]: —it defies logic in every standard, every standard.

"The Court: I'm sorry. Mr. Emerick, at some point, you have to conclude your testimony."

[17] The court stated: "You just made a gratuitous comment. Take the witness stand. Plus, this is like the third or fourth time I've asked you take the witness stand. For all that behavior, it's costing you a hundred dollars. Stop glaring at me, Mr. Emerick, and take the witness stand. The court notes that the plaintiff is glaring."

[18] For example, the court stated: "Mr. Emerick, we've had extensive discussion about exhibit—what exhibits would be admissible and what exhibits would not be admissible outside the presence of the jury. And there were certain things that were excluded because they're not admissible in evidence. You—I directed you not testify about them just a few minutes ago.

"I've repeatedly instructed you, in the course of these proceedings, not to testify about things that are not in evidence. So, I'm going to strike that— the last two or three questions concerning things that—reference to certain photographs that are not in evidence. You can testify—just so the jury understands—you can testify as to what you observed through your senses and you can offer photographs, as you have, concerning conditions on your property."

[19] Specifically, the defendant's counsel stated that "[j]ust before we recessed, you specifically instructed [the [plaintiff] and ruled that only injunctive relief is relevant to his intentional infliction of emotional distress

claim. You told him your emotional distress is not in this case. Essentially, that's what you told him. He is once again just ignoring your instructions and not—and abusing the process and prejudicing my client. He is completely ignoring what you told him before we recessed, to my client's prejudice. Emotional distress is not a part of this case; you told him that."

[20] The defendant's counsel argued as follows: "You just instructed him that this was improper, and he's not listening to the court and he hasn't listened to the court since day one."

[21] Specifically, the defendant's counsel stated: "At this point, I want to ask that you,—he's abandoned his claims. He's abandoned his claims by willingly ignoring Your Honor's instructions time and time again. I would ask for a dismissal. He has ignored what you have told him time and time again, to my client's prejudice, so I would ask that you dismiss the case."

[22] Specifically, the court stated: "I have directed you in the past not to accuse or state that the defendant's lawyer is lying. . . . I'm telling you again to stop talking. Stop talking. And do not interrupt me and do not speak over me."

[23] Specifically, the court stated: "Well, I've reviewed the motion, and I don't think it has stated any sufficient grounds for a mistrial, so the motion is denied for judicial recusal. Because rulings may be adverse, it doesn't necessarily mean, although they may be—when a ruling is adverse, and although based on law, sometimes it is difficult to accept and digest. And I can understand, Mr. Emerick, why you may be frustrated, but I—but be that as it may, there are not sufficient grounds for either a mistrial—it's not appropriate in the middle of a trial to move for recusal, unless there was something—you know, there's just not basis for it."

[24] Specifically, the court stated: "You need to ask this witness, focus your questioning on what this witness did in this particular case, within her area of expertise, and what opinions she may have, based on that, based on that, a proper foundation, what opinions she may have that are relevant to the issues in this case. That's what you need to do."

[25] At this point, the court elaborated its ruling as follows: "Ladies and gentlemen, I'm going to sustain the objection. I instructed [the plaintiff], both in your presence and outside of your presence, not to make an issue of this affidavit [exhibit 13], and I just want to explain to you a little bit more about the purpose of this affidavit. There are other proceedings that do take place in court, leading up to trial, where an affidavit is appropriate, and it has a limited utility. It doesn't mean that that affi—the reason that that affidavit, one of the reasons that that may not come into evidence at trial, is that—and one of the two primary reasons; one is that it's a hearsay document.

"It's a document that's made out of court, and to some extent—and it's not subject to cross-examination. So, in terms of the evidence that is allowed in the trial, there is a back and forth that is allowed by each side, in an effort to get to—as I will later instruct you—in an effort to assist the jury in reaching the truth.

"We get to hear both sides of any different aspect of evidence. An affidavit is hearsay and that, the fact that it's not subject to cross-examination, make it less reliable than testimony that you hear in court, which is subject to cross-examination.

"So, I don't want you to feel as though you're missing out on anything. The witness is here, and she is available to testify, and there are very specific rules of evidence that provide that in the context of a jury trial, it is not usual for a—and it's not allowable, as a principle of evidence, for an affidavit of a witness, particularly a witness who is here to testify, to have an affidavit come into evidence.

"It, in effect, would allow the witness to testify twice, once subject to cross-examination and once not subject to cross examination. So, I just want you to understand that the rules—I know you've heard me recite rules at various times for various reasons. And these rules have evolved and have been developed and written and amended over a period of time, and they exist for reasons that are rooted in the law. So, I just want to make sure that you understand that."

[26] After a careful review of the record, we are unable to identify a specific instance where the plaintiff verbally abused the court's staff.

[27] Specifically, the plaintiff quotes language from *D'Ascanio* v. *Toyota Industries Corp.*, supra, 309 Conn. 663, arguing that he had complied with "every rule and order" of the trial court. (Emphasis omitted.) As we have extensively detailed, the record contradicts the plaintiff's assertion. He next contends that the court could have permitted the proceedings to conclude,

then considered the defendant's motion for a directed verdict. In his view, this would have been preferable to "a dismissal read with a smile from a statement . . . ." We have concluded, to the contrary, that the court acted well within its discretion by dismissing the case as a sanction for his conduct. Therefore, this contention is without merit. The plaintiff again asserts that there was "no disobedience or contumacious conduct during the trial." We simply refer to our detailed description of the events before the trial court to reject this claim.

[28] We note that the plaintiff claimed in the motion for reargument that the defendant did not request the sanction of dismissal. The record does not support this statement. The defendant's counsel did, in fact, ask the court to dismiss the case on more than one occasion.

[29] "The Connecticut constitution, article first, § 10, provides: All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay. The current article first, § 10, originally appeared in article first, § 12, of the constitution of 1818." (Internal quotation marks omitted.) *Binette* v. *Sabo*, 244 Conn. 23, 27–28 n.6, 710 A.2d 688 (1998).

[30] Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate . . . ."